## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CAPITAL POWER CORPORATION, )
ET AL., )
  )
Petitioner )
  )   CASE NO. __23-1134__
v. )
  )
  )
FEDERAL ENERGY REGULATORY )
COMMISSION, )
  )
Respondent. )

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b),

Rule 15(a) of the Federal Rules of Appellate Procedure and Circuit Rule 15,

Capital Power Corporation, D. E. Shaw Renewable Investments, L.L.C., EDP

Renewables North America LLC, Invenergy Renewables LLC, Lightsource

Renewable Energy Operations, LLC, National Grid Renewables Development,

LLC, NextEra Energy Resources, LLC and RWE Renewables Americas, LLC

(Petitioners), hereby petition this Court for review of the following orders issued

by the Federal Energy Regulatory Commission (Commission), Respondent:

> 1. <u>Midcontinent Independent System Operator, Inc.</u>, Docket No. ER23-523-000, "Order on Tariff Revisions," 182 FERC ¶ 61,033 (January 27, 2023); and
>
> 2. <u>Midcontinent Independent System Operator, Inc.</u>, Docket No. ER23-523-001, "Notice Of Denial Of Rehearing By Operation Of Law And

Providing For Further Consideration," 182 FERC ¶ 62,180 (March 30, 2023).

Copies of the orders are attached to this filing as Attachment A. In the January 27, 2023 Order, the Commission accepted a tariff filing by the Midcontinent Independent System Operator, Inc. that removed compensation for reactive support as contained in Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service of its Open Access Transmission, Energy and Operating Reserve Markets Tariff. Petitioners are owners of renewable energy generation and provide reactive support in the Midcontinent Independent System Operator, Inc. and are thereby aggrieved by the Commission's actions in the January 27, 2023 Order.

In the March 30, 2023 Order, the Commission stated that it would address Petitioners' request for rehearing in a future order issued consistent with the requirements of 16 U.S.C. § 825l(a). However, pursuant to 16 U.S.C. § 825l(a), "[u]nless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied." The Commission did not issue an order by the thirty day deadline (March 29, 2023) and therefore Petitioners' request for rehearing is deemed denied and is ripe for review by this Court.

Respectfully submitted,

CAPITAL POWER CORPORATION
D. E. SHAW RENEWABLE
INVESTMENTS, L.L.C.,
EDP RENEWABLES NORTH
AMERICA LLC,
INVENERGY RENEWABLES LLC,
LIGHTSOURCE RENEWABLE
ENERGY OPERATIONS, LLC,
NATIONAL GRID RENEWABLES
DEVELOPMENT, LLC,
NEXTERA ENERGY RESOURCES,
LLC,
RWE RENEWABLES AMERICAS, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioners*

Dated:      May 23, 2023

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

CAPITAL POWER CORPORATION,    )
ET AL.,    )
    )
Petitioner    )
    )   CASE NO. <u>23-1134</u>
v.    )
    )
    )
FEDERAL ENERGY REGULATORY    )
COMMISSION,    )
    )
Respondent.    )

### CORPORATE DISCLOSURE STATEMENT OF CAPITAL POWER CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Capital Power Corporation (Capital Power) makes the following disclosures:

1. Capital Power Corporation (Capital Power) is a corporation incorporated under the laws of Canada. Capital Power develops, owns, and operates, through wholly owned or partially owned subsidiaries, utility-scale thermal and renewable generation facilities located throughout Canada and the United States. Capital Power is headquartered in Edmonton, Alberta.

2. All common shares of Capital Power Corporation (TSX ticker: CPC) are publicly held. No entity owns, or controls with power to vote,

10% or more of the outstanding voting securities of Capital Power
Corporation.

Respectfully submitted,

CAPITAL POWER
CORPORATION

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Capital
Power Corporation*

Dated:        May 23, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CAPITAL POWER CORPORATION,   )
ET AL.,   )
  )
Petitioner   )
  )   CASE NO. <u>23-1134</u>
v.   )
  )
  )
FEDERAL ENERGY REGULATORY   )
COMMISSION,   )
  )
Respondent.   )

## <u>CORPORATE DISCLOSURE STATEMENT OF D. E. SHAW RENEWABLE INVESTMENTS, L.L.C.</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, D.E. Shaw Renewable Investments, L.L.C. (D.E. Shaw) makes the following disclosures:

1. The ultimate parent of D. E. Shaw Renewable Investments, L.L.C. is D. E. Shaw & Co., L.P. (DESCO LP). DESCO LP is an Investment Adviser registered with the SEC under the Advisers Act. The general partner of DESCO LP is D. E. Shaw & Co., Inc., and the only owner of more than a 25% direct ownership interest in DESCO LP is Dr. David E. Shaw. Dr. Shaw is also the sole stockholder, chairman, and president of D. E. Shaw & Co., Inc. No publicly held corporation owns 10% or more of its stock.

Respectfully submitted,

D. E. SHAW RENEWABLE
INVESTMENTS, L.L.C.

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner D.E. Shaw
Renewable Investments, L.L.C.*

Dated:        May 23, 2023

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) ) | CASE NO. __23-1134__ |
| v. | ) ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF EDP RENEWABLES NORTH AMERICA LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, EDP Renewables North America LLC makes the following disclosures:

1. EDP Renewables North America LLC (EDP Renewables) is a limited liability company organized under the laws of the state of Delaware. EDP Renewables develops, owns, and operates, through wholly owned or partially owned subsidiaries, renewable electric generation facilities located throughout the United States. EDP Renewables' principal office is located at 1501 McKinney Street, Suite 1300, Houston, Texas 77010.

2. EDP Renewables is a wholly owned direct subsidiary of EDP Renováveis, S.A. (EDP Renováveis). Approximately 82.6% of the

share capital of EDP Renováveis is owned by EDP-Energias de Portugal, S.A. (EDPSA), through EDPSA's Spanish branch, EDP – Energias de Portugal, Sociedad Anónima, Sucursal en España. The remaining approximately 17.4% of the issued share capital of EDP Renováveis currently is publicly traded and widely disbursed among investors. None of these investors (together with its affiliates) owns or controls a 10% or greater voting interest in EDP Renováveis.

3. EDPSA is a diversified energy and utility company headquartered in Portugal, the principal subsidiaries of which own or operate assets in various European countries as well as in Brazil, Mexico, Canada and, through EDP Renewables, the United States.

4. China Three Gorges Corporation (CTG) indirectly owns a 21.55% equity interest in EDPSA. Specifically, CWEI (Europe), S.A. (CWEI (Europe)) directly owns 21.47% of EDPSA. CWEI (Europe) is wholly owned by CWEI (Hong Kong) Co. Ltd, which is wholly owned by CWE Investment Co. Ltd., which is wholly owned by CTG. CTG has no representation on EDP Renewables' executive management team.

5. CTG is a wholly state-owned enterprise of the People's Republic of China (PRC) and an independent power producer in China. The entire equity interest in CTG is held by the state-owned Assets Supervision

and Administration Commission, the PRC government agency established by the State Council that supervises the operations of state-owned enterprises within the PRC.

6. The ordinary shares of EDPSA are publicly traded on the Euronext Lisbonne exchange. None of the remaining shareholders of EDPSA (individually or collectively with its affiliates) owns or controls a 10% or greater voting interest in EDPSA.

Respectfully submitted,

EDP RENEWABLES NORTH AMERICA LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner EDP Renewables North America LLC*

Dated:    May 23, 2023

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | CASE NO.  23-1134 |
| v. | ) ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF INVENERGY RENEWABLES LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Invenergy Renewables LLC (Invenergy) makes the following disclosures:

1. Invenergy is a limited liability company organized under the laws of the state of Delaware. Invenergy develops, owns and operates renewable generation infrastructure in the United States. Invenergy's principal office is located at One South Wacker Drive, Suite 1800, Chicago, IL 60606.

2. Invenergy is privately held and no publicly held U.S. company has a 10% or greater ownership interest in Invenergy.

Respectfully submitted,

INVENERGY RENEWABLES LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Invenergy
Renewables LLC*

Dated:        May 23, 2023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CAPITAL POWER CORPORATION, ET AL.,       ) <br><br> ) <br><br> ) <br> Petitioner      ) <br>     ) <br> v.        ) <br>     ) <br>     ) <br> FEDERAL ENERGY REGULATORY ) <br> COMMISSION,     ) <br>     ) <br> Respondent.    ) | CASE NO.  23-1134 |

**<u>CORPORATE DISCLOSURE STATEMENT OF LIGHTSOURCE
RENEWABLE ENERGY OPERATIONS, LLC</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Lightsource Renewable Energy Operations, LLC (Lightsource) makes the following disclosures:

1. Lightsource is a limited liability company organized under the laws of the state of Delaware.  Lightsource's principal office is located at 400 Montgomery Street, 8th Floor, San Francisco, CA 94104.

2. Lightsource is a direct, wholly-owned subsidiary of Lightsource Renewable Energy US, LLC.   Ten percent or more of Lightsource Renewable Energy US, LLC is indirectly owned by BP p.l.c., a publicly held corporation.

Respectfully submitted,

LIGHTSOURCE RENEWABLE
ENERGY OPERATIONS, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner Lightsource
Renewable Energy Operations, LLC*

Dated:       May 23, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| | ) | CASE NO. __23-1134__ |
| v. | ) ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) | |
| | ) | |
| Respondent. | ) | |

## <u>CORPORATE DISCLOSURE STATEMENT OF NATIONAL GRID RENEWABLES DEVELOPMENT, LLC</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, National Grid Renewables Development, LLC (NG Renewables) makes the following disclosures:

1. NG Renewables is a Delaware limited liability company that develops and operates utility-scale wind, solar and energy storage projects across the country.

2. NG Renewables is an indirect wholly owned subsidiary of National Grid, plc, a company incorporated in England and Wales that is publicly traded on the New York Stock Exchange.

Respectfully submitted,

NATIONAL GRID RENEWABLES
DEVELOPMENT, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner National Grid
Renewables Development, LLC*

Dated:       May 23, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CAPITAL POWER CORPORATION, ET AL., | ) ) ) | |
| Petitioner | ) ) | |
| v. | ) ) ) | CASE NO.  23-1134 |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENT OF NEXTERA ENERGY RESOURCES, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, NextEra Energy Resources, LLC makes the following disclosures:

1. NextEra Energy Resources, LLC ("NEER"), which has a corporate address of 700 Universe Blvd, Juno Beach, Florida 33408, is a wholly-owned subsidiary of NextEra Energy Capital Holdings, Inc. NEER is developing, and owns and operates, renewable energy generating assets throughout the United States, including in the Southwest Power Pool region.

2. NextEra Energy Capital Holdings, Inc. is a wholly-owned subsidiary of NextEra Energy, Inc.  On May 11, 2023, The Vanguard Group, Inc. ("Vanguard") reported on behalf of its subsidiaries and affiliated

investment companies and funds ("Vanguard Entities") that as of March 31, 2023, they held 10.94% of the outstanding shares of NextEra Energy, Inc. NEER does not have knowledge of the actual number of outstanding shares currently held by the Vanguard Entities, including whether their holdings remain above 10% at this time.

Respectfully submitted,

NEXTERA ENERGY
RESOURCES, LLC

/s/ Bruce A. Grabow

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner NextEra Energy Resources, LLC*

Dated:       May 23, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CAPITAL POWER CORPORATION,   )
ET AL.,                      )
                             )
Petitioner                   )
                             )        CASE NO.  23-1134
v.                           )
                             )
                             )
FEDERAL ENERGY REGULATORY    )
COMMISSION,                  )
                             )
Respondent.                  )

## CORPORATE DISCLOSURE STATEMENT OF RWE CLEAN ENERGY, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, RWE Clean Energy, LLC (RWE) makes the following disclosures:

1. RWE is a limited liability company organized under the laws of the state of Delaware. RWE develops, owns, and operates electric generation and storage facilities throughout the United States. RWE's principal office is located at 353 North Clark Street, Floor 30, Chicago, Illinois 60654.

2. RWE is owned 100% by RWE Renewables International Participations BV, which, in turn, is a wholly-owned subsidiary of RWE AG, a German company. No publicly held company owns 10% or more of RWE's stock.

Respectfully submitted,

RWE CLEAN ENERGY, LLC

<u>/s/ Bruce A. Grabow</u>

Bruce A. Grabow
Jennifer Brough
LOCKE LORD LLP
701 8th Street, N.W., Suite 500
Washington, DC 20001
Telephone: (202) 220-6991
Facsimile: (202) 220-6945
bgrabow@lockelord.com
jbrough@lockelord.com

*Counsel for Petitioner  RWE Clean
Energy, LLC*

Dated:      May 23, 2023

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 23, 2023, I served a copy of the foregoing document in accordance with the Federal Rules of Appellate Procedure and the Circuit Rules upon the Solicitor of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and the Secretary of the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426 and by U.S. Mail to the parties listed below.

| Party | Served On |
|---|---|
| Ameren Services Company | Matthew Tomc<br>Ameren Corporation<br>1901 Chouteau Ave<br>MC 1310<br>St. Louis, Missouri 63040<br><br>Anne Kilburn Dailey<br>Denice Simpson<br>1331 Pennsylvania Ave, NW<br>Suite 550 South<br>Washington, DC 20004 |
| American Clean Power Association | Gabriel Tabak<br>Jason Burwen<br>American Clean Power Association<br>1501 M Street NW Suite 900<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| American Electric Power Service Corporation | Stacey Burbure<br>LaChon Turner<br>801 Pennsylvania Avenue, NW<br>Washington, DC 20004-2615 |
| American Municipal Power, Inc. | Lisa McAlister<br>Gerit F. Hull<br>Christopher Norton<br>1111 Schrock Road<br>Suite 100<br>Columbus, OH 43229 |
| AQN Wind Projects | Elizabeth Whittle<br>Nixon Peabody LLP<br>799 9TH Street NW Suite 500<br>Washington, DC 20001 |
| Basin Electric Power Cooperative | Jesse Halpern<br>Nicole Allen<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DC 20006<br><br>Jason Doerr<br>Rhonda Starck<br>Matthew Kolling<br>Rebecca Kern<br>Basin Electric Power Cooperative, Inc.<br>1717 E Interstate Avenue<br>Bismarck, North Dakota 58503 |

| Party | Served On |
|---|---|
| Bishop Hill Energy III LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Calpine Corporation | Sarah Novosel<br>Brett Kruse<br>717 Texas Ave.<br>Suite 1000<br>Houston, Texas 77002 |
| Clean Grid Alliance | Natalie McIntire<br>20 N Wacker Drive, Suite 1600<br>Chicago, Illinois 60606<br><br>Rhonda Peters<br>InterTran Energy Consulting<br>1610 S Valentine Way<br>Lakewood, Colorado 80228 |
| Coalition of Midwest Power Producers, Inc. | Scott Storms<br>5898 Garden Gate Way<br>Suite 300<br>Carmel, Indiana 46033 |

| Party | Served On |
|---|---|
| Coalition of MISO Transmission Customers | Kenneth Stark<br>McNees Wallace & Nurick LLC<br>100 Pine Street<br>Harrisburg, Pennsylvania 17101<br><br>Robert Weishaar<br>Kevin Murray<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DC 20005 |
| Consumers Energy Company | Deborah Moss<br>Consumers Energy Company<br>1730 Rhode Island Avenue NW<br>Suite 1007<br>Washington, DC 20002<br><br>Rachael Moore<br>1 Energy Plaza Drive<br>Jackson, Michigan 49201 |
| Cordelio Power | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 500<br>Washington, DC 20001 |
| Coyote Ridge Wind, LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, Wisconsin 53203 |

| Party | Served On |
|---|---|
| Crossett Solar Energy, LLC | Steven Shparber<br>Omar Bustami<br>Clark Hill PLC<br>1001 Pennsylvania Ave, NW<br>Suite 1300 South<br>Washington, DC 20000 |
| Delta's Edge Solar, LLC | Steven Shparber<br>Omar Bustami<br>Clark Hill PLC<br>1001 Pennsylvania Ave, NW<br>Suite 1300 South<br>Washington, DC 20000 |
| DTE Electric Company | Lauren Donofrio<br>Frank Niscoromni<br>DTE Energy Company<br>1 Energy Plaza<br>Detroit, Michigan 48226 |
| Duke Energy Corporation | Sheri May<br>Duke Energy Corporation<br>139 East Fourth St.<br>Cincinnati, Ohio 45202 |

| Party | Served On |
|---|---|
| Dynegy Marketing and Trade, LLC | David Ricketts<br>Jessica Miller<br>Vistra Corp.<br>1005 Congress Avenue, Suite 750<br>Austin, Texas 78701<br><br>James Quinn<br>Vistra Energy Corp.<br>325 7th St NW<br>Suite 520<br>Washington, DC 20004 |
| EDF Renewables, Inc. | Andrea Wolfman<br>Michael Chase<br>Michael Kunselman<br>Jonathan Namazi<br>Jonathan Trotta<br>Davis Wright Tremaine LLP<br>1301 K Street NW, Suite 500 East<br>Washington, DC 20005 |
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 New York Avenue NW Suite 950<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| Goose Creek Wind, LLC | Margaret Claybour<br>Sharon White<br>Rock Creek Energy Group, LLP<br>1 Thomas Circle NW Suite 700<br>Washington, DC 20005<br><br>Steven Hollingsworth<br>Apex Clean Energy, Inc.<br>310 4th St. NE, Suite 300<br>Charlottesville, Virginia 22902 |
| Great Pathfinder Wind, LLC | Margaret Claybour<br>Sharon White<br>Rock Creek Energy Group, LLP<br>1 Thomas Circle NW Suite 700<br>Washington, DC 20005<br><br>Steven Hollingsworth<br>Apex Clean Energy, Inc.<br>310 4th St. NE, Suite 300<br>Charlottesville, Virginia 22902 |
| Hallador Power Company, LLC | Zori Ferkin<br>King & Spalding LLP<br>1700 Pennsylvania Avenue, NW<br>Suite 200<br>Washington, DC 20006<br><br>Tyler Brown<br>King & Spalding LLP<br>1180 Peachtree Street NE Suite 1600<br>Atlanta, Georgia 30309 |

| Party | Served On |
|---|---|
| Hoosier Energy Rural Electric Cooperative, Inc. | Barry Cohen<br>McCarter & English LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DC 20005 |
| Illinois Commerce Commission | Christine Ericson<br>Illinois Commerce Commission<br>160 N. LaSalle St.<br>Suite C-800<br>Chicago, Illinois 60601<br><br>Katharine McCormick<br>Illinois Commerce Commission<br>160 N. LaSalle N925<br>Chicago, Illinois 60601 |
| Illinois Municipal Electric Agency | Troy Fodor<br>Illinois Municipal Electric Agency<br>3400 Conifer Drive<br>Springfield, Illinois 62711 |
| Indiana Municipal Power Agency | Colten Mitchell<br>Peter J. Prettyman<br>Indiana Municipal Power Agency<br>11610 North College Ave<br>Carmel, Indiana 46032 |

| Party | Served On |
|---|---|
| Indiana Office of Utility Consumer Counselor | Arthur Iler<br>Scott Jones<br>Indiana Office of Utility Consumer Counselor<br>115 W Washington St<br>Ste 1500 South<br>Indianapolis, Indiana 46204 |
| International Transmission Company | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |
| Iowa Association of Municipal Utilities | Stephen Pearson<br>Anree Little<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DC 20006<br><br>Tim J Whipple<br>Ahlers & Cooney P.C.,<br>100 Court Ave, Suite 600<br>Des Moines, Iowa 50309 |
| ITC Midwest LLC | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |

| Party | Served On |
|-------|-----------|
| Ledyard Windpower, LLC | Sheri May<br>Associate General Counsel<br>139 East Fourth St.<br>Cincinnati, Ohio 45202 |
| Louisiana Public Service Commission | Noel Darce<br>Stone Pigman Walther Wittmann L.L.C.<br>909 Poydras St. Suite 3150<br>New Orleans, Louisiana 70112-4042<br><br>Kathryn H Bowman<br>Executive Counsel<br>Louisiana Public Service Commission<br>602 N 5th Street<br>Baton Rouge, Louisiana 70802 |
| LWP Lessee, LLC | Michael Kunselman<br>Jonathan Trotta<br>Michael Chase<br>Jonathan Namazi<br>Davis Wright Tremaine LLP<br>1301 K Street, NW Suite 500 East<br>Washington, DC 20005 |
| Michigan Electric Transmission Company, LLC | Kyle Henne<br>ITC Holdings Corp.<br>601 13th Street NW, Suite 710S<br>Washington, DC 20005 |

| Party | Served On |
|---|---|
| Michigan Public Power Agency | Alan Robbins<br>Debra Roby<br>Thomas Steiger<br>Washington Energy Law LLP<br>900 17th Street NW STE 500-A<br>Washington, DC 20006 |
| Midcontinent Independent System Operator, Inc. | Wendy Reed<br>Wendy Warren<br>Abraham Johns<br>Wright & Talisman, PC<br>1200 G Street, N.W<br>Suite 600<br>Washington, DC 20005<br><br>Amy Thurmond<br>Adriana A Rodriguez<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, Indiana 46032 |
| Midland Cogeneration Venture Limited Partnership | Michael Rustum<br>Potomac Law Group, PLLC<br>1300 Pennsylvania Ave., Suite 700<br>Washington, DC 20004 |
| Minnesota Public Utilities Commission | Will Seuffert<br>Lauren Bethke<br>Ryan Barlow<br>Hwikwon Ham<br>Minnesota Public Utilities Commission<br>121 7th Place East, Suite 350<br>St. Paul, Minnesota 55101 |

| Party | Served On |
|---|---|
| Missouri Public Service Commission | Rodney Massman<br>Carrie L. Bumgarner<br>Valerie Groose<br>Jennifer Heintz<br>Jennie Wells<br>Dana Sanson<br>Jan Kay Davidson<br>Missouri Public Service Commission<br>200 Madison St.<br>Jefferson City, Missouri 65101<br><br>John D. Borgmeyer<br>Shelley S. Brueggemann<br>Missouri Public Service Commission<br>PO Box 360<br>Jefferson City, Missouri 65109 |
| Missouri River Energy Services | Philip Mone<br>McCarter & English<br>1301 K ST NW<br>Washington, DC 20005<br><br>Richard Dahl<br>John Weber<br>Missouri River Energy Services<br>3729 West Avera Drive<br>Sioux Falls, South Dakota 57108 |
| Mulligan Solar, LLC | Bruce Grabow<br>Locke Lord LLP<br>701 8th St. NW, Suite 500<br>Washington, DC 20001 |

| Party | Served On |
|---|---|
| Natural Resources Defense Council | Elizabeth Pearlman<br>Natural Resources Defense Council<br>20 N Wacker Drive, Suite 1600<br>Chicago, Illinois 60606 |
| Norris Electric Cooperative | Bhaveeta Mody<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street NW Suite 700<br>Washington, DC 20006 |
| NRG Power Marketing LLC | Cortney Slager<br>804 Carnegie Center<br>Princeton, New Jersey 08540<br><br>Neal Fitch<br>Dir. East Regulatory Affairs<br>NRG Energy, Inc.<br>211 Carnegie Center<br>Princeton, New Jersey 08540<br><br>Jennifer Hsia<br>Managing Senior Counsel<br>NRG Energy<br>910 Louisiana Street<br>Houston, Texas 77002 |
| Old Dominion Electric Cooperative | Adrienne Clair<br>Jecoliah R Williams<br>Thompson Coburn LLP<br>1909 K Street NW Suite 600<br>Washington, DC 20006 |

| Party | Served On |
|---|---|
| Organization of MISO States, Inc. | Marcus Hawkins<br>Brad Pope<br>Organization of MISO States, Inc.<br>811 E Washington Ave<br>Suite 400<br>Madison, Wisconsin 53703 |
| Orsted Wind Power North America LLC | Lopa Parikh<br>Orsted North America Inc.<br>1225 New York Ave NW Suite 550B<br>Washington, DC 20005 |
| Pine Gate Renewables, LLC | Brett White<br>Director, Regulatory Affairs<br>Pine Gate Renewables, LLC<br>150 U Street NE<br>Washington, DC 20002 |
| Public Utility Commission of Texas | Alan Robbins<br>Debra Roby<br>Thomas Steiger<br>Washington Energy Law LLP<br>900 17th Street NW STE 500-A<br>Washington, DC 20006<br><br>Jessie Lance<br>Public Utility Commission of Texas<br>PO Box 13326<br>Austin, Texas 78711 |

| Party | Served On |
|---|---|
| Rainbow Energy Center, LLC | Robert Fallon<br>Christina Switzer<br>Engleman Fallon, PLLC<br>1717 K Street NW<br>Washington, DC 20006 |
| Resale Power Group of Iowa | David Crawford<br>Betts & Holt LLP<br>1101 Connecticut Avenue, N.W.<br>Suite 450<br>Washington, DC 20036 |
| Rural Electric Convenience Cooperative Co. | Michael Postar<br>Bhaveeta Mody<br>Linda L. Murray-Kimball<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, N.W., Suite 700 |
| Savion, LLC | Bruce Grabow<br>Locke Lord LLP<br>701 8th Street N.W., Suite 500<br>Washington, DC 20001 |
| Shell Energy North America (US), L.P. | Sean Chang<br>Director, Regulatory Affairs<br>Shell Energy North America (US), L.P.<br>1000 Main Street<br>Houston, Texas 77002 |

| Party | Served On |
|---|---|
| Solar Energy Industries Association | Melissa Alfano<br>Ben Norris<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DC 20005 |
| Southwestern Electric Cooperative, Inc | Michael Postar<br>Bhaveeta Mody<br>Linda L. Murray-Kimball<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, N.W., Suite 700<br>Washington, DC 20006 |
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>Sustainable FERC Project<br>2 N Riverside Plaza Suite 2250<br>Chicago, Illinois 60606-2640 |
| Tatanka Ridge Wind, LLC | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Upper Michigan Energy Resources Corporation | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |

| Party | Served On |
|---|---|
| Vistra Corp. | David Ricketts<br>Jessica Miller<br>Vistra Corp.<br>1005 Congress Avenue, Suite 750<br>Austin, Texas 78701<br><br>James Quinn<br>Vistra Energy Corp.<br>325 7th St NW<br>Suite 520<br>Washington, DC 20004 |
| Wabash Valley Power Association, Inc. | Randolph Holt<br>General Counsel<br>6702 Intech Boulevard<br>Indianapolis, Indiana 46278<br><br>Jeremy L. Fetty<br>Parr Richey LLP<br>251 N Illinois Street Suite 1800<br>Indianapolis, Indiana 46204 |
| Whiting Clean Energy, Inc. | Betsy Carr<br>BP Energy Company<br>201 Helios Way<br>Houston, Texas 77079<br><br>Laura L Sigward<br>Whiting Clean Energy, Inc.<br>2155 Standard Ave<br>Whiting, Indiana  46394 |

| Party | Served On |
|---|---|
| Wisconsin Electric Power Company | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Wisconsin Public Service Corporation | Conor Ward<br>WEC Energy Group, Inc.<br>231 W. Michigan Street<br>A292<br>Milwaukee, WI 53203 |
| Wolverine Power Supply Cooperative, Inc. | Michael Rustum<br>Partner<br>Potomac Law Group, PLLC<br>1300 Pennsylvania Ave., Suite 700<br>Washington, DC 20004 |

Respectfully submitted,
/s/ Jennifer Brough
Jennifer Brough

**ATTACHMENT A – FERC ORDERS**

182 FERC ¶ 61,033
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
                        James P. Danly, Allison Clements,
                        and Mark C. Christie.

Midcontinent Independent System Operator, Inc.          Docket No.  ER23-523-000

ORDER ON TARIFF REVISIONS

(Issued January 27, 2023)

1.      On November 30, 2022, pursuant to section 205 of the Federal Power Act (FPA)[1] and Part 35 of the Commission's regulations,[2] Midcontinent Independent System Operator, Inc. (MISO),[3] on behalf of the MISO Transmission Owners (MISO TO),[4] submitted proposed revisions to Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service of its Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff).[5]  MISO TOs propose revisions to Schedule 2

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. pt. 35 (2021).

[3] MISO states that it makes the filing in its role as administrator of the Tariff, but takes no position on the substance of the filing.

[4] MISO TOs include:  Ameren Services Company, as agent for Union Electric Company, Ameren Illinois Company, and Ameren Transmission Company of Illinois; Arkansas Electric Cooperative Corporation; City Water, Light & Power (Springfield, IL); Cooperative Energy; Dairyland Power Cooperative; East Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy Texas, Inc.; Great River Energy; Indianapolis Power & Light Company; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company; and Southern Minnesota Municipal Power Agency.

[5] MISO, FERC Electric Tariff, Schedule 2, Reactive Supply and Voltage Control

to eliminate all charges under Schedule 2 for the provision of reactive power within the standard power factor range (Reactive Service)[6] from MISO TOs' own and affiliated generation resources.[7]  Based on the Commission's "comparability standard," MISO TOs state that their proposal also terminates the obligation under Schedule 2 to pay unaffiliated generation resources in MISO for reactive power within the standard power factor range.  In this order, we accept MISO TOs' proposed Schedule 2 revisions, effective December 1, 2022, as requested.

I.    **Background**

2.    Schedule 2 of the Tariff provides that the transmission provider will compensate owners of generation and non-generation resources for the capability to provide reactive power to the transmission provider to maintain transmission voltages.[8]  Such compensation is based on the annual cost-based revenue requirements or cost-based rates of such resources, as approved by the Commission.

3.    In Order No. 2003,[9] the Commission adopted a standard agreement for the interconnection of large generation facilities (*pro forma* LGIA), which includes the requirement that interconnecting generators maintain a power factor range of 0.95 leading to 0.95 lagging when synchronized to the transmission system, unless the transmission provided has established a different power factor range.[10]  Order No. 2003 requires

_____

from Generation or Other Sources Service (39.0.0).

[6] Capitalized terms used but not otherwise defined in this order have the meanings ascribed to them in the Tariff.

[7] The phrase "standard power factor range" refers to the power factor range required for interconnection and set forth in the interconnecting generator's generator interconnection agreement (GIA).  MISO's *pro forma* GIA prescribes a power factor range of 0.95 leading to 0.95 lagging.  This range is also sometimes referred to as the "deadband."

[8] MISO, FERC Electric Tariff, Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service (39.0.0).

[9] *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007).

[10] *Id.* P 542.

payment for reactive power to an interconnecting generator only when the transmission provider requests the interconnecting generator to operate its facility outside the established power factor range. With respect to reactive power within the established power factor range, the Commission initially concluded that the interconnecting generator should not be compensated for reactive power when operating within the range established in the interconnection agreement because doing so "is only meeting [the resource's] obligation."[11] However, on rehearing in Order No. 2003-A, the Commission clarified that "if the Transmission Provider pays its own or its affiliated generators for reactive power within the established range, it must also pay the Interconnection Customer."[12] This standard is generally referred to as the comparability standard.[13]

## II.    **MISO TOs' Filing**

4.      MISO TOs propose revisions to Schedule 2 of the Tariff to terminate compensation for Reactive Service for MISO TOs' own and affiliated generation resources. MISO TOs also propose, based on the comparability standard articulated in Order No. 2003-A, revisions to terminate the obligation under Schedule 2 to compensate unaffiliated generation resources.[14] Specifically, MISO TOs propose to effectuate these changes by eliminating sections II, III, and IV of Schedule 2 and adding language to section I of the Tariff to explicitly state that there will be no separate charge to compensate any generation resources for providing Reactive Service within the standard power factor range.[15] MISO TOs assert that if MISO directs a generation resource to provide reactive power outside of the standard power factor range, the generator would

---

[11] *Id.* P 546.

[12] Order No. 2003-A, 106 FERC ¶ 61,220 at P 416; *see also Bonneville Power Admin. v. Puget Sound Energy, Inc.*, 125 FERC ¶ 61,273, at P 18 (2008) (Bonneville Order on Rehearing) (describing "Order Nos. 2003 and 2003-A [as] establish[ing] a reactive power compensation policy that, in the first instance, treats the provision of reactive power inside the [standard power factor range] as an obligation of good utility practice rather than as a compensable service and permits compensation inside the [standard power factor range] only as a function of comparability.").

[13] *See, e.g.*, *Cherokee Cnty. Cogeneration Partners, LLC v. FERC*, 40 F.4th 638, 642 (D.C. Cir. 2022); *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1125 (D.C. Cir. 2011) (*Dynegy*); *Sw. Power Pool, Inc.*, 119 FERC ¶ 61,199 (*SPP*) *order on reh'g*, 121 FERC ¶ 61,196, at P 17 (2007) (SPP Order on Rehearing).

[14] Transmittal at 1-2.

[15] *Id.* at 10 & n.37.

still be compensated based on existing Tariff mechanisms, which remain unchanged under this proposal.[16]

5.      MISO TOs explain that Schedule 2 of the Tariff currently requires that any generation resource that both meets the technical qualifications in Schedule 2 of the Tariff and has its cost-based revenue requirement approved by the Commission be compensated for its capability to provide Reactive Service, regardless of whether it is in an area where there is an actual need for Reactive Service and whether any Reactive Service is actually provided.[17]  MISO TOs argue that the Commission has recently approved similar proposals submitted by Public Service Company of New Mexico and Nevada Power Company to revise Schedule 2 of their Open Access Transmission Tariffs to eliminate compensation for Reactive Service.[18]  Further, MISO TOs state that, if the proposed revisions are accepted, MISO would have a reactive power compensation regime similar to the California Independent System Operator Corporation (CAISO), under which resources recover any costs associated with reactive power capability within the standard power factor range through other revenue streams, such as energy and capacity markets.[19]

6.      MISO TOs assert that the proposed revisions to Schedule 2 do not impact reliability.  MISO TOs assert that the proposed revisions do not affect the need for or creation of reactive power, and do not affect the ongoing obligation of generators to provide reactive power.  MISO TOs state that new and existing generators in MISO will still be required to have the capability to provide reactive power within the standard power factor range as a condition of interconnection.[20]  MISO TOs explain that MISO will maintain its ability to manually redispatch individual generators for voltage control and will continue to compensate generators under a separate Tariff mechanism if MISO directs a generator to provide reactive power outside of the standard power factor range.[21]

---

[16] *Id.* at 10.  MISO TOs note that manual redispatch instruction for voltage control are rare.  *Id.* at 9 n.34.

[17] *Id.* at 2.

[18] *Id.* at 6-7 (citing *Pub. Serv. Co. of N.M.*, 178 FERC ¶ 61,088, at PP 29-31 (2022) (*PNM*); *Nev. Power Co.*, 179 FERC ¶ 61,103, at PP 20-21 (2022) (*Nevada Power*)).

[19] *Id.* at 8 (citing *Cal. Indep. Sys. Operator Corp.*, 160 FERC ¶ 61,035, at PP 7, 19-20 (2017) (*CAISO*)).

[20] *Id.* at 9-10.

[21] *Id.* at 2, 9.

MISO TOs also state that they are aware of and support MISO and its stakeholders' efforts to consider system attributes needed to maintain reliability through the resource transition in MISO.[22]

7.      MISO TOs request waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 1, 2022.[23]  Citing Commission precedent, MISO TOs argue that good cause exists to grant waiver and allow an effective date one day after the date of filing because elimination of the current Schedule 2 charges will result in a rate decrease for customers.[24]

## III.    **Notice of Filing and Responsive Pleadings**

8.      Notice of MISO TOs' filing was published in the *Federal Register*, 87 Fed. Reg. 75,623 (Dec. 9, 2022), with interventions and protests due on or before December 21, 2022.  Notices of intervention were filed by:  the Louisiana Public Service Commission; the Missouri Public Service Commission; the Illinois Commerce Commission; the Minnesota Public Utilities Commission; and the Public Utility Commission of Texas. Timely motions to intervene were filed by:  the Coalition of MISO Transmission Customers; American Electric Power Service Corporation, on behalf of its affiliate, AEP Indiana Michigan Transmission Company, Inc.; Indiana Municipal Power Agency; Michigan Public Power Agency; Calpine Corporation; Ameren Services Company, on behalf of its affiliated public utility operating companies, Ameren Illinois Company, Ameren Transmission Company of Illinois and Union Electric Company (collectively, Ameren); Wabash Valley Power Association, Inc.; DTE Electric Company (DTE Electric); NRG Power Marketing LLC; Midland Cogeneration Venture Limited Partnership; Great Pathfinder Wind, LLC; Goose Creek Wind, LLC; Duke Energy Corporation, on behalf of its franchised utility affiliates Duke Energy Indiana, LLC, Duke Energy Carolinas, LLC, Duke Energy Progress, LLC, and Duke Energy Business Services, LLC; Ledyard Windpower, LLC; Illinois Municipal Electric Agency; WEC Energy Group, Inc., on behalf of its affiliates, Bishop Hill Energy III LLC, Coyote Ridge Wind, LLC, Tatanka Ridge Wind LLC, Upper Michigan Energy Resources Corporation, Wisconsin Electric Power Company, and Wisconsin Public Service Corporation; Mulligan Solar, LLC; Hoosier Energy Rural Electric Cooperative, Inc.; American Municipal Power, Inc.; Shell Energy North America (US), L.P.; Missouri River Energy Services; Pine Gate Renewables, LLC; Consumers Energy Company; Whiting Clean

---

[22] *Id.* at 9.

[23] *Id.* at 11.

[24] *Id.* (citing *Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, at 61,338 (*Central Hudson*), *reh'g denied*, 61 FERC ¶ 61,089 (1992); *Nevada Power*, 179 FERC ¶ 61,103 at P 23; *PNM*, 178 FERC ¶ 61,088 at P 28)).

Energy, Inc.; Indiana Office of Utility Consumer Counselor; Southwestern Electric Cooperative, Inc.; Basin Electric Power Cooperative; Norris Electric Cooperative; Rural Electric Convenience Cooperative Co.; Old Dominion Electric Cooperative; and LWP Lessee, LLC. Timely motions to intervene and comments were filed by: Resale Power Group of Iowa (RPGI); Alliant Energy Corporate Services, Inc. (Alliant); Iowa Association of Municipal Utilities (IAMU); and Organization of MISO States, Inc. (OMS). Timely motions to intervene and protests were filed by: Electric Power Supply Association (EPSA); Delta's Edge Solar, LLC and Crossett Solar Energy, LLC (collectively, Cubico Parties); Capital Power Corporation, Cordelio Power LP, D. E. Shaw Renewable Investments, L.L.C., EDP Renewables North America LLC, Invenergy Renewables LLC, Lightsource Renewable Energy Operations, LLC, National Grid Renewables Development, LLC, NextEra Energy Resources, LLC, RWE Renewables Americas, LLC, and Savion, LLC (collectively, Clean Energy Generation Owners); Orsted Wind Power North America, LLC (Orsted); Solar Energy Industries Association, the Sustainable FERC Project, and Natural Resources Defense Council (collectively, SEIA); EDF Renewables, Inc. (EDF); Wolverine Power Supply Cooperative, Inc. (Wolverine); Sugar Creek Wind One LLC, Deerfield Wind Energy, LLC, Deerfield Wind Energy 2, LLC, and Odell Wind Farm, LLC (collectively, AQN Wind); Rainbow Energy Center, LLC (REC); American Clean Power Association and Clean Grid Alliance (collectively, American Clean Power); Coalition of Midwest Power Producers, Inc. and REC (collectively, Midwest Power Producers); and Vistra Corp. and Dynegy Marketing and Trade, LLC (collectively, Vistra). On December 22, 2022, DTE Electric filed comments. On December 23, 2022, Hallador Power Company, LLC (Hallador) filed a motion to intervene out of time. On January 3, 2023, International Transmission Company, Michigan Electric Transmission Company, LLC, and ITC Midwest LLC (collectively, ITC Companies) filed a motion to intervene out of time. On January 6, 2023, Alliant filed a motion for leave to answer and answer. On January 10, 2023, MISO TOs filed a motion for leave to answer and answer. On January 18, 2023, Vistra filed a motion for leave to answer and answer. On January 19, 2023, SEIA filed a motion for leave to answer and answer. On January 20, 2023, REC and Clean Energy Generation Owners filed motions for leave to answer and answer.

A.    **Comments in Support**

9.      Commenters support MISO TOs' proposal as a way to correct what they claim are unreasonable costs and the unjust imposition of costs onto consumers for excess reactive power capability.[25] Alliant argues that the current method used for compensating

---

[25] *See* Alliant Comments at 5; OMS Comments at 7; RPGI Comments at 5; IAMU Comments at 4.

generators under Schedule 2, the *AEP* methodology,[26] is unjust and unreasonable.  Alliant argues that the *AEP* methodology, which was developed for use by synchronous resources, is deeply flawed and inappropriate for the use in determining reactive power revenue requirements for asynchronous generators because synchronous and asynchronous generators utilize materially different equipment to produce reactive power.[27]  Alliant states that most new generators being connected to MISO are asynchronous generating facilities.  Alliant asserts that the *AEP* methodology requires a detailed analysis of the generator's costs for producing reactive power; however, Alliant argues that asynchronous resources lack the detailed financial records required making it virtually impossible for customers and the Commission to have confidence that the charges being collected are just and reasonable.[28]  Alliant asserts that the current method of compensating generators also imposes excessive administrative costs on affected transmission customers, who must participate in multiple reactive power rate proceedings filed by generators with the Commission.[29]  Additionally, commenters argue that the current compensation structure that pays for capability provides no true incentive to locate in a region where Reactive Service is needed and/or actually provide Reactive Service.[30]  OMS argues that because the current rules allow essentially any generator within MISO to apply for Reactive Service compensation, an increasing number of generators have recently sought compensation and transmission customers and their ratepayers are obligated to pay for these increasing charges even if they have not been needed or provided a benefit.[31]

10.    Alliant also argues that the potential increase in the financial burden of reactive power charges on MISO transmission customers during the next few years is substantial, and the proposed revisions are needed to protect against this additional financial burden. For example, Alliant states that since October 2020, the annual reactive power revenue requirement charges across MISO pricing zones have increased $31 million,

---

[26] *Am. Elec. Power Serv. Corp.*, Opinion No. 440, 88 FERC ¶ 61,141 (1999), *order on reh'g*, 92 FERC ¶ 61,001 (2000) (*AEP*); *Dynegy Midwest Generation, Inc.*, Opinion No. 498, 121 FERC ¶ 61,025 (2007), *order on reh'g*, 125 FERC ¶ 61,280 (2008).

[27] Alliant Comments at 4.

[28] *Id.* at 4-5.

[29] *Id.* at 6-7.

[30] *Id.* at 5; DTE Electric Comments at 3.

[31] OMS Comments at 3.

approximately 17%, and it is expected to continue to increase.[32]  Commenters argue that the proposal benefits MISO transmission customers through lower rates because MISO would no longer charge transmission customers under Schedule 2 for Reactive Service, thereby lowering the total costs of transmission and ancillary services.[33]  Commenters also argue that MISO TOs' proposal creates a clean slate for MISO and stakeholders to reevaluate reactive power compensation and work together to create an appropriate compensation structure in the future.[34]

11.      Additionally, commenters agree with MISO TOs that the proposal will have no negative impacts on reliability.[35]  For example, Alliant states that, in the event a generating unit needed for reliability purposes in MISO is unable to realize sufficient revenues from participating in competitive capacity and energy markets to sustain its operations, it may seek a System Support Resource (SSR) designation pursuant to section 38.2.7 of the Tariff.[36]  Alliant states that any generator designated as an SSR may be eligible to receive cost-based compensation to support its continued operation up to its full cost-of-service.[37]  OMS points out that new and existing generators will still be required to provide reactive power within the standard power factor range as a condition of interconnection and where a resource is redispatched, the Tariff already contains market mechanisms to allow such resources to recover their costs.[38]  IAMU also notes that other regional transmission organization (RTO) and non-RTO transmission providers that do not offer capability-based reactive power compensation operate with no apparent harm to transmission system reliability.[39]  DTE Electric asserts that although the current rate mechanism may not be needed to maintain reliability, DTE Electric is concerned with the potential reliability impacts to the transmission system as more intermittent generation resources increase the complexity and cost for MISO to maintain system reliability.  DTE Electric encourages MISO to evaluate and propose by 2024 a new

---

[32] Alliant Comments at 10.

[33] IAMU Comments at 5; OMS Comments at 4; RPGI Comments at 4-5.

[34] OMS Comments at 6-7; DTE Electric Comments at 4.

[35] Alliant Comments at 12; IAMU Comments at 5; OMS Comments at 6.

[36] Alliant Comments at 12.

[37] *Id.*

[38] OMS Comments at 6 (citing MISO, Tariff, Module C, § 40.3.5 (30.0.0); *id.*, § 40.3.6; (30.0.0) *id.*, Schedule 27 (54.0.0)).

[39] IAMU Comments at 5.

performance-based product that would provide reactive supply and voltage support and incentives to locate reactive supply where it is needed.[40]

12.    Furthermore, commenters assert that the proposal follows Commission precedent and will align MISO with other RTOs, such as Southwest Power Pool, Inc. (SPP) and CAISO, which do not compensate generators for providing reactive power capability within the standard power factor range.[41]  Alliant states that, in *Nevada Power*, the Commission rejected arguments that elimination of compensation for Reactive Service was not just and reasonable because the generators had made investments in their generating facilities based on the expectation that they would receive compensation for reactive power service.[42]  IAMU states that under Commission policy, generators are not required to be compensated for reactive power within the standard power factor range, unless compensating their own resources, and even where a transmission provider has before offered such capability-based compensation, the Commission does not obligate a transmission provider to continue to compensate independent generation if it stops compensating its own resources.[43]

13.    Finally, IAMU states that it supports MISO TOs' request for waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 1, 2022.[44]  IAMU states that good cause exists to grant waiver, and MISO TOs seek to implement a rate decrease as promptly as possible to benefit all MISO transmission customers that currently pay the Schedule 2 rate.[45]

**B.    Protests**

14.    Protesters argue that the proposal is unjust and unreasonable and MISO TOs failed to properly follow the procedures outlined in Appendix K of the Agreement of Transmission Facilities Owners to Organize the MISO, A Delaware Non-Stock

---

[40] DTE Electric Comments at 4-5.

[41] *See* OMS Comments at 5; IAMU Comments at 3-4; Alliant Comments at 10; RPGI Comments at 5.

[42] Alliant Comments at 10 (citing *Nevada Power*, 179 FERC ¶ 61,103).

[43] IAMU Comments at 3-4 (citing *Nevada Power*, 179 FERC ¶ 61,103).

[44] *Id.* at 6.

[45] *Id.*

Corporation (MISO TO Agreement).[46]  Protesters state that Appendix K of the MISO TO Agreement governs MISO and MISO TOs' respective rights to make filings pursuant to FPA section 205.[47]  Protesters state that Article II, section I of Appendix K establishes that MISO TOs and MISO hold joint FPA section 205 filing rights for ancillary services (other than Schedule 1), with any ancillary service proposal with regional impacts being subject to requirements of Articles III and IV of Appendix K.[48]  Protesters further state that Article III of Appendix K describes the voting requirements that MISO TOs must satisfy before submitting an FPA section 205 filing,[49] and Article IV, section A of Appendix K requires MISO TOs submitting an FPA section 205 filing to "provide MISO and all other Owners[50] with at least thirty (30) days' notice before submitting any FPA section 205 filing that is subject to this Article IV as provided for in Article II of this Appendix K, unless circumstances require shorter notice, in which case the Owner(s) shall use reasonable efforts to provide as much notice before the filing as possible."[51] Protesters assert that MISO TOs provided less than 30 days' notice to stakeholders and did not vet the proposal in the stakeholder process.[52]  Protesters state that, on November

---

[46] American Clean Power Protest at 2-3; Midwest Power Producers Protest at 6-7; AQN Wind Protest at 4-6; Cubico Parties Protest at 4-5; Midcontinent Independent System Operator, Inc., MISO Rate Schedules, MISO Transmission Owner Agreement (30.0.0).

[47] American Clean Power Protest at 2-3; Cubico Parties Protest at 5.

[48] American Clean Power Protest at 3; Cubico Parties Protest at 5.

[49] American Clean Power Protest at 3.

[50] The MISO TO Agreement defines "Owner" as a utility or other entity which owns, operates, or controls facilities for the transmission of electricity in interstate commerce.

[51] American Clean Power Protest at 3 (citing MISO TO Agreement, App. K, arts. I, II, IV); Cubico Parties Protest at 5.

[52] Orsted Protest at 6; American Clean Power Protest at 3-5 (citing *PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,015 (2008) (rejecting a filing because PJM failed to comply with the stakeholder review procedures stated in its tariff); *Indep. Oil & Gas Ass'n of W. Va.*, 18 FERC ¶ 61,289, at 61,608 (1982) (holding that the contractual validity of a rate filing must be determined before deciding if the rate is just and reasonable); *Ohio Edison Co.*, 43 FERC ¶ 61,316, at 61,881 & n.7 (1988) (rejecting a rate filing that conflicted with a contractual obligation set forth in a Commission-approved settlement agreement); *Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 115 FERC ¶ 61,375, at P 32 (2006) ("If the Agreement is not valid and binding, the Commission need not consider whether the just and reasonable standard or the public interest standard

14, 2022, MISO issued notice to its stakeholders regarding MISO TOs' intent to submit the filing, which it received from MISO TOs on November 11, 2022, which is 19 days prior to the submission of MISO TOs' November 30, 2022 filing.[53]  Accordingly, protesters assert that MISO TOs had no authority to submit the filing under FPA section 205.[54]  Clean Energy Generation Owners also argue that MISO TOs' filing should be rejected because MISO TOs have failed to identify which entities are a public utility capable of providing ancillary services that MISO TOs claim has voting rights for authorizing FPA section 205 filings.[55]  In addition, Clean Energy Generation Owners argue that MISO TOs fail to explicitly identify all of the MISO TOs that have assets that provide Schedule 2 services and without this information it is not possible to know whether a majority of the eligible MISO TOs voted in favor of the proposal.[56]

15.     Protesters also contend that MISO TOs do not have unilateral FPA section 205 authority to propose amendments to Schedule 2 that result in an elimination of payments to independent power producers because that right is reserved for the reactive power resource owner and the public utility providing the service.[57]  Protesters argue that MISO TOs' proposal undercuts the unilateral rights of independent power producers to file their own cost-based revenue requirements for the provision of reactive power under FPA

---

should apply.")); Cubico Parties Protest at 4-6 (citing *PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,015; *Indep. Oil & Gas Ass'n of W. Va.*, 18 FERC at 61,608); *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012-13 (D.C. Cir. 2005) (explaining that the Commission must provide parties with adequate notice of the issues to be decided)); AQN Wind Protest at 5-6 (citing *Champion Energy Mktg., LLC v. PJM Interconnection, LLC*, 153 FERC ¶ 61,059, at P 31 (2015) (*Champion*) (finding that the failure to properly engage stakeholders before making a filing requesting wide ranging tariff changes is a ground for rejecting such request)).

[53] American Clean Power Protest at 3-4; Cubico Parties Protest at 5.

[54] American Clean Power Protest at 5; Cubico Parties Protest at 6.

[55] Clean Energy Generation Owners Protest at 8-9.

[56] *Id.*

[57] Midwest Power Producers Protest at 6-10 (citing MISO, FERC Electric Tariff, Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service (39.0.0), § III.D.1); Vistra Protest at 26-28 (citing MISO, FERC Electric Tariff, Schedule 2, Reactive Supply and Voltage Control from Generation or Other Sources Service (39.0.0), § III.D.1; 16 U.S.C. § 824d(d); *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (stating that "Section 205 of the [FPA] gives a utility the right to file rates and terms for services rendered with its assets.")).

section 205 because they are proposing to eliminate generation resources' approved rates by modifying Schedule 2.[58]  Moreover, protesters argue that MISO TOs' proposal stands to improperly nullify the vast number of individually adjudicated and Commission-approved reactive power settlements, and MISO TOs' proposal is more appropriately characterized as seeking to change existing rates without going through the statutorily mandated process required under FPA section 206[59] required for a third party or the Commission to change an existing rate.[60]  REC argues that the filing also has the effect of depriving it of its right under FPA section 206 to have its existing rate changed only by a Commission determination.[61]  Protesters also argue that if the Commission accepts MISO TOs' proposal that did not properly follow procedure, it may allow MISO TOs to bypass FPA section 206 processes in the future.[62]

---

[58] Midwest Power Producers Protest at 10-14; REC Protest at 6-7 (citing *Pub. Service Comm'n of the State of N.Y. v. FERC*, 866 F.2d 487, 489 (D.C. Cir. 1989); *Atlantic City*, 295 F.3d at 9-10 (internal citations omitted); *PJM Interconnection, L.L.C.*, 110 FERC ¶ 61,234, at P 22 (2005), *review dismissed,* 468 F.3d 845 (D.C. Cir. 2006); *PJM Interconnection, L.L.C.*, 111 FERC ¶ 61,257, at P 18 (2005)); Vistra Protest at 27-28 (citing *PJM Interconnection, L.L.C.*, 110 FERC ¶ 61,234 at P 22).

[59] 16 U.S.C. § 824e.

[60] American Clean Power Protest at 13 (citing *Emera Me. v. FERC*, 854 F.3d 9, 25 (D.C. Cir. 2017) (internal citations omitted) (*Emera Maine*)); REC Protest at 6, 9-11 (quoting *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 114 n.2 (D.C. Cir. 2017) (citing *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984)); *Midwest Indep. Sys. Operator, Inc.*, 110 FERC ¶ 61,380, at PP 17-18 (2005); *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 (2008) (*MISO*)); Cubico Parties Protest at 10 (citing *Emera Maine*, 854 F.3d at 25); Vistra Protest at 27-28 (citing *PJM Interconnection, L.L.C.*, 110 FERC ¶ 61,234 at P 22 ("Under the FPA, attempts by one utility to change the rate of another utility must be made pursuant to section 206, together with a showing that the existing rate of the other utility is unjust or unreasonable").

[61] REC Protest at 9 (citing *PJM Interconnection, L.L.C.*, 110 FERC ¶ 61,234 at P 22; *MISO*, 122 FERC ¶ 61,305, at P 38).

[62] American Clean Power Protest at 13; Clean Energy Generation Owners Protest at 30-31; Cubico Parties Protest at 10.

16.     Protesters further assert that MISO TOs do not adequately justify the proposed changes and MISO TOs rely on inappropriate Commission precedent.[63] Vistra argues that the precedent cited by MISO TOs is not determinative and that the evaluation of whether a proposed rate design is just and reasonable must be based on the specific characteristics of the region or market at issue.[64] AQN Wind contends that *PNM* and *Nevada Power* are distinguishable from the instant proposal, because in those proceedings, the transmission owners proposed to eliminate the reactive power revenues of their own generation resources and unaffiliated generation resources connected to their systems; whereas, here, MISO TOs' proposal applies to all MISO generators, including generators interconnected to systems of MISO Transmission Owners that did not join the filing.[65] AQN Wind also states that, in *PNM*, the transmission owner carved out from its elimination of Reactive Service revenue a certain wind generator because, in part, "the Commission accepted [the generator's] reactive power revenue requirement subject to settlement and hearing"; however no such carve out was proposed by MISO TOs.[66] EDF and Vistra argue that the implications of eliminating Schedule 2 Reactive Service compensation on a MISO-wide basis reaches far wider than the *PNM*, *Nevada Power*, and *CAISO* precedent.[67] Specifically, EDF states that MISO operates one of the world's largest energy and operating reserves markets throughout 15 U.S. states and the Canadian province of Manitoba, serving approximately 42 million people. Therefore, EDF argues the potential impacts from eliminating Schedule 2 reactive power compensation are much more significant.[68] EDF argues that the Commission in Order No. 828 recognized the importance of reactive power in addressing the reliability of the Bulk Power System

---

[63] American Clean Power Protest at 12; AQN Wind Protest at 6; Vistra Protest at 12; Midwest Power Producers Protest at 17; American Clean Power Protest at 8; REC Protest at 12; EDF Protest at 14; Clean Energy Generation Owners Protest at 10-16.

[64] Vistra Protest at 12 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 127 FERC ¶ 61,109, at P 20 (2009) ("[i]t is well established that there can be more than one just and reasonable rate"); *Sw. Power Pool, Inc.*, 158 FERC ¶ 61,063, at P 13 (2017); *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,063, at P 39 (2007)).

[65] AQN Wind Protest at 8.

[66] *Id.*

[67] EDF Protest at 15 (citing *PNM*, 178 FERC ¶ 61,088; *Nevada Power*, 179 FERC ¶ 61,103; *CAISO*, 160 FERC ¶ 61,035); Vistra Protest at 12-14.

[68] EDF Protest at 15 (citing MISO, *About MISO*, https://www.misoenergy.org/about/ (last visited Dec. 21, 2022); MISO, *Corporate Fact Sheet*, https://www.misoenergy.org/about/media-center/corporate-fact-sheet/).

through a changing resource mix and demand shifts.[69]  Moreover, Vistra argues that the circumstances are different because in both *PNM* and *Nevada Power* only a small number of unaffiliated generation resources had recently filed for reactive power compensation at the time of the transmission provider's filings.[70]

17.    Protesters argue that eliminating compensation under Schedule 2 for Reactive Service could undercut the economic viability of many independent power producers, and as a result create or exacerbate reliability problems in the region by accelerating the retirement of uneconomic resources.[71]  EDF contends that reactive power compensation provided under Schedule 2 is a valuable revenue stream on which generators depend, and one that factors greatly into the ongoing economics of these projects.[72]  EDF and Midwest Power Producers assert that the proposal will disrupt the system of generators relying on reactive power compensation and will increase the number of generators seeking retirement to be designated as SSRs.[73]  EDF and Midwest Power Producers argue that notwithstanding the proposal, current economic conditions have already resulted in an increasing number of generator retirements, leading to more resources being designated as SSRs.[74]  For example, Midwest Power Producers state that on August 19,

---

[69] *Id.* at 9-10 (citing *Requirements for Frequency & Voltage Ride Through Capability of Small Generating Facilities*, Order No. 828, 156 FERC ¶ 61,062 (2016)).

[70] Vistra Protest at 12-13 (citing *PNM*, 178 FERC ¶ 61,088 (identifying a single unaffiliated generation resource); *Nevada Power*, 179 FERC ¶ 61,103 (identifying three unaffiliated generation resources)).

[71] EPSA Protest at 3; SEIA Protest at 6-12 (citing *Sw. Power Pool, Inc.*, 119 FERC ¶ 61,199, at P 4 (2007) (*SPP*) *order on reh'g*, 121 FERC ¶ 61,196 (requiring SPP to factor in reliability to a proposal to remedy unduly discriminatory procurement of reactive power) (citing *Calpine Oneta Power, L.P.*, 116 FERC ¶ 61,282, at P 75 (2006))); Wolverine Protest at 4-10 (citing *Calpine Oneta Power, L.P.*, 116 FERC ¶ 61,282 at P 75; *SPP*, 119 FERC ¶ 61,199 at P 4); Cubico Parties Protest at 8-9 (citing *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1176 (D.C. Cir. 1987) (*Jersey Cent.*) (application of the FPA's just and reasonable standard requires review of the entirety and total effect of a Commission rate order and such order's consequences); EDF Protest at 4, 6-16; American Clean Power Protest at 11-12, 16 (citing *Jersey Cent.*, 810 F.2d at 1176); Clean Energy Generation Owners Protest at 23-24; Midwest Power Producers Protest at 4, 17-19, 23; Orsted Protest at 6-7; REC Protest at 10-11, 14-16; Vistra Protest at 3-13.

[72] EDF Protest at 6.

[73] *Id.* at 7; Midwest Power Producers Protest at 19.

[74] EDF Protest at 7-8 (citing MISO, *Information on Attachment Y (Generator Change of Status) Requests with Reliability Issues*,

2022, MISO requested approval to designate Rush Island 1 & 2, Missouri-based coal-fired generators, as SSRs because of severe voltage issues caused by the retirement of the facilities.[75]

18.     Relatedly, protesters argue that, even with the availability of payments for the provision of reactive power outside of the standard power factor range, generation developers will have an incentive to make only the minimum investments required to meet the reactive power requirements set out in their GIAs, which, given the projected penetration of renewable resources, may prove insufficient.[76]  Wolverine and SEIA assert that MISO historically has rarely called for reactive supply outside the standard power factor range and nowhere close to often enough to meet the suppliers' reactive power related revenue requirements.[77]  Wolverine and SEIA note that if generation is not designed with sufficient capabilities to operate beyond the standard power factor range, MISO may not have enough resources with reactive power capability to bring the system back into a reliable state during emergency conditions.[78]  Vistra argues that eliminating reactive power compensation when the markets are not adequately retaining resources necessary to maintain reliability is incompatible with the Commission's statutory duty to ensure reliable service at just and reasonable rates.[79]

---

https://www.oasis.oati.com/woa/docs/MISO/MISOdocs/Attachment_Y_Information.html (last visited Dec. 21, 2022)); Midwest Power Producers at 18 (citing Independent Market Monitor for MISO, *2021 State of the Market Report for the MISO Electricity Markets*, at 127, https://cdn.misoenergy.org/20220622%20Markets%20Committee%20of%20the%20BOD%20Item%2004%20IMM%20State%20of%20the%20Market%20Report625261.pdf (2021 Independent Market Monitor Report)).

[75] Midwest Power Producers Protest at 18 (citing MISO, Transmittal, Docket No. ER22-2691, at 5 (filed Aug. 19, 2022)).

[76] Vistra Protest at 11-12: SEIA Protest at 7; Wolverine Protest at 3.

[77] Wolverine Protest at 5; SEIA Protest at 6-7.

[78] Wolverine Protest at 5-6; SEIA Protest at 6-7.

[79] Vistra Protest at 7-9 (citing *Gainesville Utils. Dep't v. Fla. Power Corp.,* 402 U.S. 515, 529 (1971) (acknowledging that the Commission has "responsibility to the public to assure reliable efficient electric service"); *Wholesale Competition in Regions with Organized Elec. Mkts.*, Order No. 719, 125 FERC ¶ 61,071, at P 1 (2008), *order on reh'g*, Order No. 719-A, 128 FERC ¶ 61,059, *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009) (acknowledging that the Commission has a "statutory mandate to ensure supplies of electric energy at just, reasonable and not unduly discriminatory or

19.    Protesters also argue that the proposal will ultimately result in increased costs to ratepayers. EDF argues that MISO TOs' proposal risks increasing power costs in the region, as it will likely result in an increase to the cost of capital for developers and exacerbate transmission congestion in MISO and the costs to deliver power.[80] EDF states that the filing undermines stability and certainty within MISO, creating regulatory and market uncertainty that will have a chilling effect on investment in reactive power capabilities.[81] EDF and American Clean Power argue that MISO TOs' proposal will likely result in higher prices in power purchase agreements.[82]

20.    Furthermore, protesters argue that MISO TOs proposal does not satisfy the comparability standard. First, protesters argue that the instant proposal does not provide for comparable treatment because MISO TOs that own generation, unlike independent power producers, will be able to recover revenue requirements for their generation resources as part of their retail rate filings, and earn compensation via a rate of return on the equipment that provides reactive power within the standard power factor range.[83] Wolverine, Clean Energy Generation Owners, and SEIA argue that MISO TOs have failed to demonstrate that they have removed the generation plant investment associated with the production of reactive power from retail rates and that they are not charging retail customers for the fixed costs of reactive power equipment unless their plants must operate outside the standard power factor range.[84] While Wolverine and SEIA acknowledge that retail rates are beyond the scope of the Commission's jurisdiction, they argue that *Conway* requires that the Commission find that MISO TOs proposal is unjust and unreasonable because of the ability of the MISO TOs to recover through retail rates the reactive power portion of their generators' total plant investment.[85] Vistra argues that

---

preferential rates"); *Md. Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 127 FERC ¶ 61,274, at P 18 (2009) ("We cannot find that a replacement rate that may jeopardize PJM's ability to provide reliable service is just and reasonable")).

[80] EDF Protest at 10.

[81] *Id.* at 12 (citing *The New PJM Cos.*, 105 FERC ¶ 61,251, at P 96 (2003)).

[82] *Id.*; American Clean Power Protest at 11.

[83] Cubico Parties Protest at 7; Midwest Power Producers Protest at 17; American Clean Power Protest at 7-9.

[84] Wolverine Protest at 14; Clean Energy Generation Owners Protest at 20-21; SEIA Protest at 2.

[85] Wolverine Protest at 4, 14-15 (citing *FPC v. Conway Corp.*, 426 U.S. 271 (1976) (*Conway*), *aff'd,* 510 F.2d 1264 (D.C. Cir. 1975); *Commonwealth Edison Co.*, 8 FERC ¶ 61,277, at 61,848 (1979); *Sunoco, Inc. (R&M) v. Transcontinental Gas Pipe Line*

comparability standard was meant to protect competitive generation resources; however Vistra alleges that MISO TOs' proposal will have a discriminatory effect. Therefore, even if the proposal may comply on its face with the comparability standard, the Commission is still required to ensure that the proposal is just and reasonable and not unduly discriminatory or preferential.[86]

21.    Relatedly, protesters argue that the instant proposal is unduly discriminatory because MISO TOs will continue to be compensated for their transmission installed reactive devices, while independent power producers will not be able to recover the costs of generation-based reactive power.[87]  SEIA, for example, argues that it would be unduly discriminatory to allow transmission owners to fully recover their costs of installing transmission-installed reactive devices (e.g., capacitors) through transmission rate base while denying generators meaningful opportunity to recover the costs of generation-based reactive power.[88]  While some protesters acknowledge that the Commission has recognized that generators may be able to negotiate rates for real power sufficient to compensate them for costs they incur in producing reactive power within the standard power factor range, they contend that independent power producers will be at a disadvantage compared to MISO TOs and affiliated generators because independent power producers' revenues are limited to the prices they can realize from the competitive wholesale markets.[89]

22.    In addition, protesters argue that the proposal is contrary to the principle of cost causation because unaffiliated generators are burdened with the cost of developing the capability of Reactive Service even though they are not the beneficiaries of the Reactive

---

*Corp.*, 114 FERC ¶ 61,180, at P 28 & n.20 (2006) (citing Commission authority under *Conway* to take non-jurisdictional rates and charges into account so long as the remedy affects only jurisdictional rates)); SEIA Protest at 3-5 (citing *Conway*, 426 U.S. 271).

[86] Vistra Protest at 2, 14-17 (citing *Dynegy*, 633 F.3d at 1127).

[87] Wolverine Protest at 15-16; SEIA Protest at 4-5; American Clean Power Protest at 9-11 (citing *Cal. Indep. Sys. Operator Corp.*, 128 FERC ¶ 61,072, at P 27 (2009); *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 59 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[88] *See, e.g.*, SEIA Protest at 4-5 (citing *SPP*, 119 FERC ¶ 61,199 at P 39).

[89] *Id.* at 5; Cubico Parties Protest at 7.

Service, while some transmission customers who benefit from the service will pay nothing.[90]

23.     Vistra states that the fact that generators are required to provide Reactive Service mandates that those resources be given the opportunity to recover those costs because the Commission cannot deny a utility a reasonable return on its investment.[91] Vistra contends that MISO TOs' proposal violates the Takings Clause of the Fifth Amendment to the U.S. Constitution because it would effect a "taking" of the property interest of generation resources, especially those merchant generators that cannot otherwise recover the costs of developing and maintaining reactive power capability from ratepayers.[92]

---

[90] Midwest Power Producers Protest at 20 (citing *K N Energy v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004); *S. Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014)); REC Protest at 17-18 (citing *W. Sys. Power Pool*, 122 FERC ¶ 61,139, at P 27 (2008)); Vistra Protest at 16-17.

[91] Vistra Protest at 17-18 (citing *Pub. Sys. v. FERC*, 709 F.2d 73, 80 (D.C. Cir. 1983) (citing *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 690 (1923) (*Bluefield*)); *Jersey Cent.*, 810 F.2d at 1176 (discussing *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (*Hope*)).

[92] *Id.* at 17-18, 21-25 (citing *Jersey Cent.*, 810 F.2d at 1177 (citing *Wash. Gas Light Co. v. Baker*, 188 F.2d 11, 15 (D.C. Cir. 1950)); *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08 (1989) ("If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments" of the Constitution); *Bluefield*, 262 U.S. at 690 ("Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render service are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment."); *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1501 (D.C. Cir. 1984) (rate orders that fall within a "zone of reasonableness," where rates are neither "less than compensatory" "nor excessive" are "just and reasonable"); *Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968) (rate orders "may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable"); *Boroughs of Ellwood City v. FERC*, 731 F.2d 959, 967 (D.C. Cir. 1984); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 (1992); *Penn. Cent. Transp. Co. v. N.Y. City*, 428 U.S. 104, 124 (1978); *U.S. of Am. v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 952-53 (9th Cir. 2008) (transfer of property to private parties for the purpose of "facilitating the consolidation of [an] electricity market" constitutes "public use" within the meaning of the Takings Clause); *Reagan v. Farmer's Loan & Tr. Co.*,

Vistra argues that generation owners, which must make direct investments in building and maintaining reactive power capability, have a protected property interest in the electricity that these investments produce.[93]  Vistra also argues that MISO TOs' proposal violates the Due Process Clause of the U.S. Constitution because generation resources have a legal obligation under their GIAs to provide Reactive Service.[94]  Vistra argues that MISO TOs' proposal would compel generators to give up any economically beneficial use of the reactive power that they are required to supply to the transmission system, resulting in the appropriation of these generators' property interests in the reactive power and depriving the generators of their property interests in the reactive power.[95]  Vistra also argues that "at a minimum, the existence of this serious constitutional issue is further reason to reject MISO TOs' proposal as unjust and unreasonable."[96]

24.      EDF and Orsted argue that the Commission should reject MISO TOs' proposal and, instead, address the issues raised in the filing in broader proceedings, for example, the Commission's pending generic proceeding on reactive power compensation.[97]  EDF, Cubico Parties, and Orsted request that if the Commission accepts the proposal, the Commission find that the revisions do not apply to any generation resources that have already proposed a revenue requirement for Reactive Service that was accepted by the Commission prior to the effective date of the filing.[98]  Alternatively, EDF and Cubico Parties argue that the Commission could include a transition or phase out mechanism,

---

154 U.S. 362, 409-10 (1894); *F.C.C. v Fla. Power Corp.*, 480 U.S. 245, 253 (1987); *Hope*, 320 U.S. at 602).

[93] *Id.* at 21-23 (citing *Powerex Corp. v. Dep't of Revenue*, 357 Or. 40, 66 (2015); *In re Erving Indus., Inc.*, 432 B.R. 354, 370 (Bankr. D. Mass. 2010); *Gadsden Indus. Park, LLC v. U.S.*, 956 F.3d 1362, 1364 & n.8 (Fed. Cir. 2020); *Horne v. Dept. of Agric.*, 576 U.S. 350, 359, 367 (2015); *James v. Campbell*, 104 U.S. 356 (1881)).

[94] *Id.* at 21-25 (citing *SPP*, 119 FERC ¶ 61,199 at P 5; *Horne v. Dept. of Agric.*, 576 U.S. at 364-365).

[95] *Id.* at 23.

[96] *Id.* at 21 (citing *Gonzalez v. U.S.*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" a court's "'duty is to adopt the latter'") (citations omitted)).

[97] EDF Protest at 16 (citing *Reactive Power Capability Comp.*, Notice of Inquiry, 177 FERC ¶ 61,118 (2021) (Reactive Power NOI)); Orsted Protest at 5.

[98] EDF Protest at 2; Orsted Protest at 7-8; Cubico Parties Protest at 12.

whereby generators may recover reactive power revenues under Schedule 2 for a limited period of time.[99]  Protesters argue that the Commission should deny MISO TOs' request for waiver of the Commission's 60-day prior notice requirement and their requested December 1, 2022 effective date.[100]  EDF and American Clean Power also argue that the Commission should suspend MISO TOs' filing for the maximum five-month period, and take action to develop a more complete record in this proceeding regarding MISO TOs' proposal and its impacts to system reliability in MISO.[101]  EDF argues that MISO TOs' claim in support of their request that the filing will result in a rate decrease discounts the financial harm that will result to EDF and to other affected generators throughout MISO as a result of the proposed Tariff changes.[102]

### C.    **Answers**

25.    Alliant and MISO TOs contend that MISO TOs' filing is within their authority under the MISO TO Agreement.  MISO TOs state that, contrary to protesters' claims, MISO TOs are not required to engage with stakeholders when exercising their FPA section 205 rights under the MISO TO Agreement.  MISO TOs assert that the Commission specifically has found that there is no requirement for a stakeholder process when MISO TOs choose to exercise their FPA section 205 filing rights set forth in Appendix K of the MISO TO Agreement to modify Schedule 2 of the Tariff.[103]  Further, MISO TOs argue that in *Champion*, the Commission was directing the complainant to the proper channels it should have taken to address its ongoing issue, but actually rejected the

---

[99] EDF Protest at 19-20; Cubico Parties Protest at 13 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 109 FERC ¶ 61,168, at PP 2, 59 (2004); *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,163, at P 3 (2004)).

[100] EDF Protest at 2; Vistra Protest at 28-29; AQN Wind Protest at 8-9 (citing *Techren Solar II LLC*, 172 FERC ¶ 61,128, at P 24 (2020); *Airport Solar LLC*, 172 FERC ¶ 61,276, at P 21 (2020); *Red Horse Wind 2, LLC*, 171 FERC ¶ 61,247, at P 20 (2020)).

[101] EDF Protest at 17-18; American Clean Power Protest at 15 (citing *W. Tex. Utils. Co.*, 18 FERC ¶ 61,189, at 61,375 (1982) ("Also, in cases in which increased revenues do not appear to be excessive, but other, extraordinary factors indicate that wholesale customers may suffer irreparable harm absent a five month suspension, we shall order a maximum suspension."); *Pac. Gas & Elec. Co.*, 173 FERC ¶ 61,140, at P 42 (2020); *Midwest Indep. Transmission Sys. Operator, Inc.*, 116 FERC ¶ 61,124, at P 30 (2006); *Old Dominion Elec. Coop.*, 99 FERC ¶ 61,189, at 61,770 (2003)).

[102] EDF Protest at 18-19.

[103] MISO TOs Answer at 29-30 (citing *MISO*, 122 FERC ¶ 61,305 at P 24; *Dynegy*, 633 F.3d at 1129).

filing in that case on other grounds, so the case does not support AQN Wind's contention.[104]  MISO TOs assert that arguments that they did not provide adequate notice before filing are erroneous.  MISO TOs explain that they are only required to provide MISO and all other Owners with at least 30 days' notice.  MISO TOs state that all Owners knew about the filing and a vote of all Owners as to whether to make an FPA section 205 filing was taken on October 21, 2022.  MISO TOs state that MISO was notified on October 30, 2022 and was provided with a description of the filing and a copy of the draft tariff revisions.[105]  MISO TOs claim that the statement MISO circulated was informational for stakeholders and occurred after the date when the Owners provided notice to MISO of the planned filing.  Additionally, MISO TOs claim that even though they had no obligation to do so, before filing the proposed revisions they conducted outreach to the MISO stakeholder community through Advisory Committee representatives and discussed the proposal during informal meetings with several stakeholders.[106]

26.    MISO TOs also aver that protesters' contentions that a majority of transmission owners did not vote to authorize the filing is incorrect.  MISO TOs explain that the published list of transmission owners on MISO's website is not the same as the transmission owners that are authorized under Appendix K of the MISO TO Agreement to make FPA section 205 filings.[107]  MISO TOs argue instead that only owners that are public utilities under the FPA also have filing rights under FPA section 205, which is a much smaller group than all transmission owners in MISO.  Furthermore, MISO TOs argue that the group of Owners with filing rights for Schedule 2 revisions is further limited to those Owners that own or control generation or other resources capable of providing ancillary services.[108]  MISO TOs also dispute protesters' argument that the filing should have only been made with a unanimous vote of all Owners.  MISO TOs argue that only a majority vote of Owners is required to make a FPA section 205 filing and that a large majority of Owners that are geographically distributed across MISO's footprint voted to make the filing.[109]

---

[104] *Id.* (citing AQN Wind Protest at 5; *Champion*, 153 FERC ¶ 61,059 at P 28).

[105] *Id.* at 30.

[106] *Id.*

[107] *Id.* at 31.

[108] *Id.* at 31-32 (citing MISO TO Agreement, App. K §§ I.1, I.I, II.I).

[109] *Id.* (citing Clean Energy Generation Owners Protest at 11-12; MISO TO Agreement, App. K § III.A).

27.     In response to protesters' claims that the rights reserved to MISO TOs to submit filings under FPA section 205 to govern the rates, terms and conditions applicable to the provision of Reactive Service relate only to rates, terms, and conditions of Reactive Service supplied by generation resources owned by MISO TOs, Alliant and MISO TOs argue that the express language of the MISO TO Agreement is not so limited. Specifically, Alliant and MISO TOs contend that MISO TOs have the right pursuant to the MISO TO Agreement to file changes to Schedule 2 pursuant to FPA section 205 that apply to all generation facilities being compensated for the supply of Reactive Service under Schedule 2.[110]  MISO TOs argue that Vistra incorrectly applies the holding in *Dynegy*; while the court in *Dynegy* found that the overriding concern was for the equal treatment of the Reactive Service compensation for all generators, the proposed revisions in the instant filing would eliminate Reactive Service compensation for all generators under Schedule 2.  MISO TOs also argue that the finding in *Dynegy* that MISO TOs have FPA section 205 filing rights was necessary for the court's ultimate ruling, making it precedent, contrary to Vistra's argument.[111]  MISO TOs also argue that *Dynegy* invalidates protesters' arguments that MISO TOs have the authority to revise Schedule 2 only as to their own revenue requirements.[112]  In addition, contrary to protesters' arguments, Alliant argues that Commission precedent confirms that if a transmission provider modifies its tariff to discontinue payment to its own or affiliated generators for Reactive Service, it may simultaneously discontinue payments for Reactive Service to non-affiliated generators.[113]  Furthermore, notwithstanding protesters attempt to distinguish between stand-alone transmission providers and RTOs, Alliant argues that the Commission has generally applied the same principles of non-discriminatory transmission service to both stand-alone transmission providers and RTOs.[114]

---

[110] Alliant Answer at 3-4 (citing *MISO*, 122 FERC ¶ 61,305 at P 24; *Dynegy*, 633 F.3d at 1128-29); MISO TOs Answer at 32 (citing *Dynegy*, 633 F.3d at 1128-29).

[111] MISO TOs Answer at n.96 (citing Vistra Protest at 16, 26-28 & n.64; *Dynegy*, 633 F.3d at 1127-28; *Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *Gabbs Expl. Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963)).

[112] *Id.* at 33-34 (citing AQN Wind Protest at 8; Midwest Power Producers Protest at 13; *Dynegy*, 633 F.3d at 1129).

[113] Alliant Answer at 5 (citing *E.ON U.S. LLC*, 119 FERC ¶ 61,340, at P 20 (2007) (*E.ON*)).

[114] *Id.* at 5-6.

28.    Furthermore, MISO TOs disagree with protesters' assertions that the precedent MISO TOs cited in the filing is not applicable or comparable, and argue that the precedent cited demonstrates instances in which the Commission accepted similar filings, consistent with the foundational principles that the Commission holds.[115]  Specifically, MISO TOs dispute the argument that these cases are not comparable given MISO's footprint and size, arguing that this is irrelevant to underlying principles that the Commission adheres to when considering such changes.[116]  Additionally, MISO TOs argue that they hold the right to propose such a FPA section 205 change, and that Public Service Company of New Mexico and Nevada Power Company not being in an RTO or ISO does not serve as a valid distinction between the instant filing and precedent.[117]  Further, MISO TOs describe how CAISO generators, who do not receive compensation for Reactive Service from CAISO,[118] can still recover reactive power costs through power purchase agreements, to highlight another mean for generators to seek compensation for reactive power other than Schedule 2.[119]

29.    Alliant also argues that the claims that the proposed revisions to Schedule 2 will impair reliability of the MISO transmission system are speculative.  Alliant contends that protesters have not provided any credible evidence to demonstrate that the proposed revisions to Schedule 2 may jeopardize the reliability of electric service.[120]  MISO TOs state that protesters' claims are not supported by evidence and distract from the fact that generators are obligated to provide reactive power within the standard power factor range regardless of compensation and that "no showing by non-affiliates that their reactive

---

[115] MISO TOs Answer at 13.

[116] *Id.* (citing *Nevada Power*, 179 FERC ¶ 61,103 at P 20; *PNM*, 178 FERC ¶ 61,088 at P 29; *CAISO*, 160 FERC ¶ 61,035 at P 19).

[117] *Id.* at 14 (citing Order No. 2003, 104 FERC ¶ 61,103; *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. N.Y. v. FERC*, 535 U.S. 1 (2002)).

[118] *Id.* at 15 (citing *CAISO*, 160 FERC ¶ 61,035 at PP 19-20).

[119] *Id.*

[120] Alliant Answer at 6-7.

power is needed can create an entitlement to compensation that trumps the Commission's comparability policy."[121]  MISO TOs argue that the Commission has held that because reactive power compensation is required for an interconnecting generator to deliver power, Reactive Service is generally not compensable.[122]  MISO TOs further argue that the Commission has even held that reactive power compensation is not required where investments were made at the transmission provider's direction.[123]  In addition, Alliant argues that in the absence of detailed financial evidence showing that generators within MISO would be unable to continue operation without the stream of revenues for the supply of Reactive Service currently afforded under Schedule 2, there is no rational basis to conclude that the proposed revisions to Schedule 2 might threaten the reliability of the MISO transmission system.[124]  MISO TOs also point to other RTOs and non-RTO transmission providers that do not provide capability-based reactive power compensation arguing that there is no apparent harm to reliability.[125]  MISO TOs note that generators are subject to the same reactive power requirements as condition of initial and ongoing interconnection to the transmission system so there will be no sudden loss of reactive power capability.[126]  MISO TOs argue that it is extremely unlikely that generators will somehow limit their facilities so they are not able to provide reactive power outside of the deadband or choose to purchase equipment that only meets the minimum requirements because generator equipment typically comes with reactive power capabilities that goes beyond the standard range requirements.[127]  Further, MISO TOs argue that generators are

---

[121] MISO TOs Answer at 16, 23 & n.53 (citing *Bonneville Power Admin. v. Puget Sound Energy, Inc.*, 120 FERC ¶ 61,211, at P 25 (2007) (*Bonneville*); *SPP*, 119 FERC ¶ 61,199 at PP 28-29; Order No. 2003, 104 FERC ¶ 61,103 at P 546).

[122] *Id.* at 17 (citing SPP Order on Rehearing, 121 FERC ¶ 61,196 at P 15; *Ariz. Pub Serv. Co.*, 95 FERC ¶ 61,128, at 61,409 (2001)).

[123] *Id.* at 17-18 (citing *PNM*, 178 FERC ¶ 61,088 at P 33; *Nevada Power*, 179 FERC ¶ 61,103 at 21-22).

[124] Alliant Answer at 7.

[125] MISO TOs Answer at 6 (citing OMS Comments at 6; IAMU Comments at 5).

[126] *Id.* at 18.

[127] *Id.* at 19 (citing Wolverine Protest at 5; EPSA Protest at 5; EDF Protest at 9-10; *Mulligan Solar, LLC*, Reactive Power Compensation Filing, Docket No. ER22-1815-000, attach. B, Ex. MS-1, at 9:9-13 (filed May 9, 2022); *Sac County Wind, LLC*, Reactive Power Compensation Filing, Docket No. ER22-1136-000, attach. B, Ex. SC-1, at 9:12-16 (filed Mar. 1, 2022); *Glaciers Edge Wind Project, LLC*, Reactive Power Compensation Filing, Docket No. ER22-865-000, attach. B, Ex. GE-1, at 9:3-6 (filed Jan. 21, 2022)).

incentivized by their own reliability requirements to install equipment that is most likely to keep them online and delivering real power.[128]  MISO TOs also note that MISO's open and transparent transmission planning processes continually evaluate the capability of the transmission system to meet reliability criteria, including for reactive power capability, and require new transmission system facilities to address any deficiencies, including MISO's Attachment Y SSR process.  MISO TOs explain that SSR designations, which are temporary until transmission reinforcements can be installed, show that the MISO process works as MISO's planning processes consider the retirement of generators and continually assess system performance against reliability requirements.[129]  In addition, MISO TOs state that, across multiple, ongoing initiatives, MISO continually assesses on a more macro level both the present and future reliability of the region.  MISO TOs explain that MISO stakeholders are engaged in assessments of resource attributes, including reactive power, in light of the evolving resource mix.  MISO TOs argue that protesters ignore the ongoing obligation of generators to provide reactive power.  MISO TOs contend that SEIA has acknowledged in a webinar question and answer sheet that reactive power compensation does not affect a generator's operations and is required regardless of compensation.[130]

30.    MISO TOs assert that protesters' claims of decreased reliability try to distract from whether the Schedule 2 revisions are just and reasonable.  MISO TOs argue that they have demonstrated that the Schedule 2 revisions are just and reasonable based on Commission precedent and the anticipated reduction in rate, whereas protesters would want to hold to the *status quo*, in which MISO is required to continue to pay generators for their capability to provide reactive power even though generators are obligated to provide reactive power regardless of compensation.[131]  MISO TOs argue that, under FPA section 205, the proponent does not have to demonstrate that all other alternatives are

---

[128] *Id.* at 20.

[129] *Id.* at 21-22.

[130] *Id.* at 22-23 & Ex. I (*Reactive Power Compensation: How to Unlock New Revenue Opportunities for Solar and Storage Projects,* SEIA, (July 29, 2020), https://www.seia.org/sites/default/files/2020-08/Speaker%20Q%26A%20-%20Reactive%20Power%20Compensation%20Webinar.pdf).

[131] *Id.* at 24-25.

unjust and unreasonable,[132] or that the proposal is the most just and reasonable,[133] because there can be more than one just and reasonable rate.[134]

31.    Alliant argues that MISO TOs' proposal treats all generation facilities in MISO on a non-discriminatory basis.  Alliant contends that, although the revisions to Schedule 2 will discontinue a separate stream of revenues to generation project owners for Reactive Service, generation project owners that rely on market-based rates can charge for capacity, energy and other services that result in a desired revenue stream.  Alliant notes that the Commission has found that if a transmission provider discontinues payments for Reactive Service under its tariff, both generators affiliated with the transmission provider and merchant generators "equally, may be able to recover the costs for reactive power within the [standard power factor range] in other ways — such as through higher power sales rates of their own."[135]

32.    Alliant contends that *Conway*, which Wolverine relies on to argue that it would be appropriate for the Commission "to consider the transmission owners' recovery through retail rates of the Reactive Power portion of their total generation plant investment," involved allegations that a utility's rates for wholesale electric service were

---

[132] *Id.* at 24 (citing *Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 61,076, at P 45 (2007) ("Since the CAISO filed its proposal under FPA section 205, it must show that its proposed changes are just and reasonable, but it is not required to show that the existing policy is unjust and unreasonable.")).

[133] *Id.* (citing *Oxy USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995) (stating that "the Commission may approve [a revised rate schedule] . . . if it is 'just and reasonable'; it need not be the only reasonable methodology, or even the most accurate"); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) ("[The Commission] has interpreted its authority to review rates under [FPA section 205] as limited to an inquiry into whether the rates proposed by a utility are reasonable — and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs.")).

[134] *Id.* (citing *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,213, at P 70 (2018) (citing *Sw. Power Pool, Inc.*, 158 FERC ¶ 61,063 at P 13); *Midwest Indep. Transmission Sys. Operator, Inc.*, 127 FERC ¶ 61,109 at P 20; *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282, at P 29 (2006) ("[T]he just and reasonable standard under the FPA is not so rigid as to limit rates to a 'best rate' or 'most efficient rate' standard. Rather, a range of alternative approaches often may be just and reasonable")).

[135] Alliant Answer at 9-10 (citing *Bonneville*, 120 FERC ¶ 61,211 at P 21).

discriminatory and anticompetitive in relation to its rates for retail electric service.[136] Alliant notes that the Commission adopted detailed procedures for consideration of such allegations in section 2.17 of its regulations.[137] Alliant argues that absent a showing by Wolverine that any recovery by MISO TOs of costs allocable to Reactive Service through retail rates after the proposed revisions have taken effect is having an anticompetitive impact, there is no basis for the Commission to consider the policies underlying *Conway* when acting on the proposal. Further, MISO TOs refute the claim that the proposed revisions fail under the *Conway* analysis, asserting that the Commission is not required by *Conway* to adjust transmission owners' rates to effectuate a retail rate adjustment.[138]

33.     MISO TOs assert that the argument that the transmission owners hold a competitive advantage by being able to charge such relative power costs through state-regulated cost-based rates or otherwise charge customers is beyond the scope of this filing.[139] MISO TOs observe that the Commission has previously rejected this argument. MISO TOs state that, on rehearing of its acceptance of SPP's revisions to Schedule 2 to remove compensation for Reactive Service, the Commission found that claims that transmission owners must demonstrate they are not charging retail customers for reactive power were outside the scope of SPP's filing and beyond the Commission's jurisdiction.[140]

34.     Alliant notes that protesters allege that Commission-jurisdictional rates for transmission service enable MISO TOs to recover costs of Reactive Service supplied through assets connected to their transmission systems, and that transmission rates should similarly be adjusted to remove such costs if the proposed revisions to Schedule 2 become effective. Alliant argues that the Commission has ruled that transmission-related costs may not be recovered through charges for Reactive Service.[141] Therefore, Alliant contends that there is no justification for removing costs of capacitors and other transmission-related equipment used to supply Reactive Service to the system from

---

[136] *Id.* at 11.

[137] 18 C.F.R. § 2.17 (2021).

[138] MISO TOs Answer at 10-12 (citing SPP Order on Rehearing, 121 FERC ¶ 61,196 at PP 19-20).

[139] *Id.* at 8-9 (citing SPP Order on Rehearing, 121 FERC ¶ 61,196 at PP 16-18).

[140] *Id.* at 9-10 (citing *SPP*, 119 FERC ¶ 61,199 at P 37).

[141] Alliant Answer at 12 (citing *Chehalis Power Generating, LP*, 123 FERC ¶ 61,038, at PP 55, 63, 69 (2008)).

transmission rates of MISO TOs after the proposed revisions to Schedule 2 become effective.[142]

35.    MISO TOs disagree with protesters and argue that the proposed revisions do not violate cost causation principles because generators will still be compensated for their generation's reactive power supply for instances where reactive power is required outside of the deadband, under existing Tariff provisions.[143]  MISO TOs argue that the payment within the deadband violates cost causation because there is no determination of need for the capability within the deadband or determination of real-time market performance. Further, MISO TOs assert that protesters incorrectly refocus the argument in an attempt to require payment for a service they are already obligated to provide as a condition for interconnection.[144]  MISO TOs assert that cost causation is the principle that the customer should pay for a cost that they cause, but it does not apply as protesters argue to suppliers that receive compensation for services provided.[145]  MISO TOs argue that protesters attempt to collaterally attack Order No. 2003, which requires that interconnecting generators provide Reactive Service without compensation with a few exceptions.[146]

36.    Alliant further argues that protesters have not presented clear evidence that some generators may realize lower revenues.  Alliant contends that this potential of a lower revenue stream does not demonstrate that the proposed revisions to Schedule 2 are unjust and unreasonable.  On the contrary, Alliant argues that the proposed revisions will protect MISO TOs, including Alliant, from having to pay for Reactive Service that is not needed.[147]

37.    Alliant contends that the Commission should permit the proposed revisions to become effective December 1, 2022, as requested.  Alliant argues that the proposed revisions will reduce charges for Reactive Service to zero.  Alliant states that MISO does not oppose this reduction in charges for Reactive Service and protesters have not

---

[142] *Id.*

[143] MISO TOs Answer at 26 (citing Transmittal at 9).

[144] *Id.* at 27.

[145] *Id.* (citing *K N Energy, Inc. v. FERC*, 968 F.2d at 1300; *Entergy Ark., LLC v. FERC*, 40 F.4th 689, 692 (D.C. Cir. 2022); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018)).

[146] *Id.* at 27 & n.81 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 52; Order No. 2003-A, 106 FERC ¶ 61,220 at P 34).

[147] Alliant Answer at 12-13.

demonstrated that this change in rates for Reactive Service is unjust and unreasonable. Alliant further argues that, until recently, many owners of renewable energy generation facilities connected to the MISO transmission system, including many protesters to the instant proceeding, provided Reactive Service as required by their respective GIAs without charge.[148]  Alliant contends that, although protesters complain about the potential impact of the proposed revisions, there is no evidence that any of the generation project owners will discontinue operation of any of their generation facilities within MISO if the proposed revisions to Schedule 2 take effect as proposed.  Therefore, Alliant argues, under the circumstances, any such delay in implementation of the revisions to Schedule 2 would be unreasonable and should be rejected.

38.     Finally, Alliant contends that acceptance of the proposed revisions will encourage modernization of the arrangements for compensating generators for Reactive Service. For example, Alliant states that the proposed revisions will create a clean slate on which all stakeholders engaged in review of arrangements needed to protect system reliability during the transition to greater reliance on energy from non-synchronous generation facilities can work.  Alliant believes that since no stakeholder will have a strong interest in maintaining the *status quo*, it will be easier for MISO and all stakeholders to achieve a consensus on arrangements for protecting system reliability during and after the transition, including arrangements for compensation of generation owners that supply Reactive Service needed to protect system reliability.[149]

39.     MISO TOs argue that the precedent clearly states that providing sufficient reactive power is an obligation of a generator that is interconnected to the system and generators are not required to be compensated for reactive power within the standard power factor range unless there is a comparability issue.[150]  MISO TOs argue that the Commission should not overturn Commission policy and precedent by eliminating the bedrock comparability standard.[151]  Further, MISO TOs assert that, contrary to protesters' arguments, the proposed revisions satisfy the comparability standard since all

---

[148] *Id.* at 14 (citing Clean Energy Generation Owners Protest at 5-6).

[149] *Id.* at 15-16.

[150] MISO TOs Answer at 3 (citing Order No. 2003, 104 FERC ¶ 61,103 at P 546; *SPP*, 119 FERC ¶ 61,199 at PP 28-29).

[151] *Id.* at 7 (citing *Mich. Elec. Transmission Co.*, 97 FERC ¶ 61,187, at 61,852-53 (2001); Order No. 2003-A, 106 FERC ¶ 61,220 at P 416 (announcing comparability of compensation); *accord* Order No. 2003-B, 109 FERC ¶ 61,287 at PP 113, 119; *Entergy Servs., Inc.*, 113 FERC ¶ 61,040, at PP 22-24, 38-39 (2005) *order denying reh'g*, 114 FERC ¶ 61,303 (2006) (Entergy Rehearing Order)).

interconnecting generators to MISO, including the transmission owners' generating resources, will be unable to receive compensation under Schedule 2.[152]

40.     Additionally, MISO TOs assert that the instant filing and the Order No. 2003 requirement for generators to provide reactive power within the deadband do not violate the Takings Clause and the Due Process Clause of the U.S. Constitution.[153]  MISO TOs state that the contractual relationship entered into when a generator interconnects with MISO's transmission system does not implicate a taking that must be compensated or a taking that is unconstitutional, just because the changes would "impact the benefit and burdens" of the agreement.[154]  MISO TOs assert that the proposed Schedule 2 revisions would not violate the Due Process Clause because property interests are not created by the Constitution and generators do not have a legitimate claim of entitlement to compensation.[155]

41.     MISO TOs contend that both the number of generators seeking reactive power compensation and the total amount of compensation paid under Schedule 2 has been rapidly growing.  MISO TOs argue that the Commission should take action now to stop these costs to transmission customers from increasing, despite protesters' arguments that action should be postponed until the Commission has acted on the pending Reactive Power NOI.[156]

42.     Vistra and SEIA argue that the reliability implications of the proposal are not speculative, as MISO TOs and Alliant claim, but are based on economic realities recognized by MISO and the MISO independent market monitor.  For example, Vistra points out that the MISO independent market monitor has reported that over 5 gigawatts of generation have retired prematurely in recent years because low market prices

---

[152] *Id.* at 8.

[153] *Id.* at 27 n.81 (citing Vistra Protest at 21-25; Order No. 2003, 104 FERC ¶ 61,103 at PP 52, 546; Order No. 2003-A, 106 FERC ¶ 61,220 at PP 34, 416).

[154] *Id.* (citing *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000-A, 139 FERC ¶ 61,132, at PP 368-69 (citing *Connolly v. Pension Guaranty Corp.*, 475 U.S. 211, 224 (1986)), *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014); *Connolly*, 475 U.S. at 223).

[155] *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Del. Riverkeeper Network v. FERC*, 895 F.3d 102, 108-09 (2018) (citing *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005))).

[156] *Id.* at 4, 41 (citing Reactive Power NOI, 177 FERC ¶ 61,118).

prevented the resources from recovering their costs.  Vistra further avers that the MISO independent market monitor has reported that the revenues available through the MISO markets are well short of the levels needed to encourage investment, resulting in a capacity shortage that is expected to continue to grow.[157]  SEIA contends that protesters have identified potential reliability concerns associated with loss of financial incentive to include robust reactive power capability for generators.[158]  For example, SEIA contends that without Schedule 2 compensation, developers of non-synchronous resources face a different business case when considering whether to invest in equipment with capability for the provision of reactive power not just within but also outside of the standard power factor range.  Vistra disputes MISO TOs' argument that independent power producers will be able to recover the lost reactive power capability revenues in the market, arguing that the costs are neither variable costs that could be included in an energy offer nor going-forward costs that could be included in a capacity offer.[159]  Vistra also argues that the SSR program was not designed to be a substitute for compensating resources for reliability services and it would not be reasonable to expect a generation resource to announce in this proceeding its intent to retire if the proposal is accepted.[160]  Vistra also contends that Alliant and MISO TOs fail to provide evidence to support the assumption that simply requiring compliance with the minimum reactive power requirements set out in GIAs is enough to maintain system reliability.[161]  Moreover, Vistra and SEIA contend that MISO TOs' proposal will eliminate any incentive for resources to invest in reactive power capabilities beyond what is necessary to ensure minimum compliance with the terms of their GIAs.[162]

43.     SEIA contends that MISO TOs' allegation that SEIA acknowledged that reactive power compensation does not affect a generator's operations and is required regardless of compensation was taken out of context.[163]  SEIA argues that within context, SEIA's

---

[157] Vistra Answer at 2-3 (citing 2021 Independent Market Monitor Report at 83).

[158] SEIA Answer at 3.

[159] *Id.* at 3.

[160] *Id.* at 3-4 (citing Alliant Answer at 7; *Midwest Indep. Transmission Sys. Operator, Inc.*, 140 FERC ¶ 61,237, at PP 86-87, 89 (2012) (recognizing that premature disclosure of retirement decisions can have negative reliability, economic, and political concerns)).

[161] *Id.* at 5.

[162] *Id.* at 5-6; SEIA Answer at 2.

[163] SEIA Answer at 4-5 (citing MISO TOs Answer at 23, 36-27).

webinar question and answer sheet describes the way reactive power compensation works and that filing for reactive power compensation would not impact the generator's operating profile in that generators still have agency over their bid behaviors.  SEIA asserts that in the larger sense, the availability of reactive power compensation may significantly affect the design and operations of generation resources.  SEIA states that neither the webinar question and answer sheet nor the webinar addressed the concerns articulated by SEIA and other stakeholders in the instant proceeding and in the Reactive Power NOI.[164]

44.     Vistra argues that the Takings Clause precedent to which MISO TOs cite in their answer relates only to abstract contractual rights, whereas Vistra contends that generation resources have property rights in the reactive power that they generate.[165]  Vistra contends that these property rights exist independent of the contractual relationship between the parties.  Vistra avers that MISO TOs' argument that generation resources are required to provide reactive power is proof of the "coercive nature of the taking."[166]  Vistra further argues that MISO TOs failed to address Vistra's argument that the elimination of all compensation for reactive power would constitute a confiscatory rate that violates the Due Process Clause.[167]  Finally, Vistra argues that *Dynegy* is neither binding nor persuasive because the dicta in *Dynegy* was not "fully debated" and the court's recognition of MISO's right to file a revised schedule was not necessary for the court's ultimate ruling.[168]

45.     REC contends that while the MISO TOs claim the proceeding is about "comparability," the proposal is really about forcing MISO to provide reactive power service to transmission service customers for free, regardless of the capital invested to develop reactive capability.[169]  REC notes that transmission service customers create the need for this valuable service and should pay a rate for that service.[170]  REC argues that if the Commission decides to accept the MISO TOs' proposal, the Commission should state

---

[164] SEIA Answer at 5.

[165] Vistra Answer at 6 (citing MISO TOs Answer at 27 n.81).

[166] *Id.* at 6-7.

[167] *Id.*

[168] *Id.* at 7 (citing *Dynegy*, 633 F.3d at 1129; *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006)).

[169] REC Answer at 6-7.

[170] *Id.* at 6-9.

that, after the effective date of the Commission's approval of the proposal, MISO will be required to pay REC its reactive power revenue requirement until a proper filing is made under FPA section 206.[171]

46.     Clean Energy Generation Owners claim that MISO TOs failed to address the point that MISO TOs continue to be compensated for reactive service in transmission rates and have not committed to remove reactive assets from transmission rate base, which Clean Energy Generation Owners argue is *per se* unduly discriminatory and preferential in violation of the FPA.  Further, Clean Energy Generation Owners argue that if reactive power is not needed from generation, then MISO TOs do not need independent power producer generation to be on-call to provide reactive support; yet, MISO TOs fail to commit to removing this requirement from GIAs.[172]  In addition, Clean Energy Generation Owners claim that independent power producers cannot simply add costs for providing reactive power to existing power purchase agreements because power purchase agreements cannot be reopened to increase the rate.[173]

47.     Further, Clean Energy Generation Owners argue that the instant filing is differentiated from *SPP*, *PNM*, and *Nevada Power*, in that here, MISO, the transmission provider, has not filed to cancel reactive power compensation.[174]  Clean Energy Generation Owners also argue that in *CAISO*, the transmission provider had never collected a charge under Schedule 2 of its Open Access Transmission Tariff, and the market functioned by recovering all costs in power purchase agreement rates, whereas in MISO, power purchase agreement market rates have been developed over the past 18 years separate and apart from reactive power compensation.  Clean Energy Generation Owners aver that MISO TOs provide no information explaining how the market will adjust to allow future power purchase agreement rates to increase to accommodate the lost reactive power compensation.[175]  Further, Clean Energy Generation Owners argue that the Commission has never applied the comparability standard in a market where less than all the transmission owners have concurred.[176]  Additionally, Clean Energy Generation Owners states that MISO has acknowledged that due to a resource transition

---

[171] *Id.* at 1-2.

[172] Clean Energy Generation Owners Answer at 8-9.

[173] *Id.* at 10, 12-13 (citing OMS Comment at n.9).

[174] *Id.* at 11 (citing *SPP*, 119 FERC ¶ 61,199; *PNM*, 178 FERC ¶ 61,088; *Nevada Power*, 179 FERC ¶ 61,103).

[175] *Id.* at 12-13 (citing *CAISO*, 160 FERC ¶ 61,035; OMS Comment at n.9).

[176] *Id.* at 12.

toward inverter-based generation in lieu of synchronous generation, "local reliability attribute scarcity can, and is, creating system-wide risks."[177]

48.      Clean Energy Generation Owners argue that MISO TOs are attempting to use the MISO TO Agreement in an abusive, unduly discriminatory, and preferential manner. Clean Energy Generation Owners claims that MISO TOs intend to address voltage deficiency from retiring generation with "transmission reinforcements."[178]  Additionally, Clean Energy Generation Owners argue that MISO has recently approved the 2022 MISO Transmission Expansion Plan, which includes $146 million of new, planned buildout of reactive support and voltage control devices that MISO TOs will earn complete cost recovery on plus a rate of return that includes an RTO adder.[179]  With regard to MISO TOs' argument that the structure and charges for reactive service in MISO are continually increasing, Clean Energy Generation Owners state that 350 MISO transmission owner generating units are receiving reactive power compensation compared to only 50 wind and solar generators that are collecting compensation under Schedule 2 in MISO.  Clean Energy Generation Owners argue that the majority of the recent increase in reactive service compensation has been in the Ameren Illinois zone, but that the Illinois Commerce Commission has not supported MISO TOs' proposal because it could "negatively impact the ability of consumers to access reliable electric power at reasonable rates."[180]

---

[177] *Id.* at 13-14 (citing MISO, *System Attributes Stakeholder Workshop*, at 2, 4, 13 (Sept. 21, 2022), https://cdn.misoenergy.org/20220921%20System%20Attributes%20Workshop%20Presentation626391.pdf).

[178] *Id.* at 16-17 (citing MISO TOs Answer at 21-22, 28; *Xcel Energy Servs., Inc. v. FERC*, 41 F.4th 548, 561 (D.C. Cir. 2022) (quoting *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 684 (D.C. Cir. 2000) (per curium), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002); citing *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 536 (2008))).

[179] *Id.* at 16-17 (citing MISO, *MTEP22 Executive Summary*, at 10, https://cdn.misoenergy.org/MTEP22%20Executive%20Summary626707.pdf).

[180] *Id.* at 15-16.

## IV.    Discussion

### A.    Procedural Matters

49.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2021), the notices of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

50.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant Hallador's and ITC Companies' late-filed motions to intervene given their interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

51.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2021), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.  We accept all the answers because they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

52.    For the reasons discussed below, we accept MISO TOs' proposed Schedule 2 revisions, effective December 1, 2022, as requested.  We find that MISO TOs' proposed Schedule 2 revisions are just and reasonable and not unduly discriminatory or preferential.  As articulated in Order No. 2003, "the Interconnection Customer should not be compensated for reactive power when operating its Generating Facility within the established power factor range, since it is only meeting its obligation."[181]  In Order No. 2003-A, the Commission clarified, however, that "if the Transmission Provider pays its own or its affiliated generators for reactive power within the established range, it must also pay the Interconnection Customer."[182]  Consistent with Order No. 2003 and 2003-A, where a transmission provider does not separately compensate its own or affiliated generators for reactive power service within the standard power factor range, it is not required to separately compensate non-affiliated generators for reactive power service within the standard power factor range.[183]  Comparability entitles a generator to compensation for providing reactive power within the standard power factor range "*if, and only if,* the [t]ransmission [p]rovider pays its own or affiliated generators for reactive

---

[181] Order No. 2003, 104 FERC ¶ 61,103 at P 546.

[182] *See* Order No. 2003-A, 106 FERC ¶ 61,220 at P 416.

[183] *See id.*; *Nevada Power*, 179 FERC ¶ 61,103 at P 21; *see also PNM*, 178 FERC ¶ 61,088 at P 29.

power within the [standard power factor range]."[184]  We find that MISO TOs' proposed Schedule 2 revisions to eliminate compensation for its own and affiliated generation resources and unaffiliated generation resources and the associated charges to transmission customers, is permitted under, and consistent with Order Nos. 2003 and 2003-A.[185]  Accordingly, we find that the proposal is just and reasonable.[186]

53.     Order Nos. 2003 and 2003-A do not mandate that once a transmission provider compensates its own or affiliated generators it may never discontinue such compensation and must, as a result, always compensate unaffiliated generators.  Rather, the Commission's precedent allows transmission providers to eliminate compensation for reactive power within the standard power factor range for all generators, regardless of whether the generator is owned by or otherwise affiliated with a transmission owner or is independent.[187]  Bearing in mind that the provision of reactive power within the standard power factor range is, in the first instance, an obligation of the interconnecting generator and good utility practice, MISO TOs do not have an obligation to continue to compensate

---

[184] *Bonneville*, 120 FERC ¶ 61,211 at 19 (quoting *SPP*, 119 FERC ¶ 61,199 at n.27).

[185] *See, e.g.*, *PNM*, 178 FERC ¶ 61,088 at P 29 (accepting revisions to Schedule 2 to eliminate Reactive Service compensation); *Nevada Power*, 179 FERC ¶ 61,103 at P 20 ("We find . . . that [Nevada Power Company's] proposed Schedule 2 revisions to eliminate compensation for its own generation and the associated charges to transmission customers is permitted under, and consistent with, Commission policy and precedent"); *Bonneville*, 120 FERC ¶ 61,211 at P 20 ("Commission policy clearly allows [Bonneville Power Administration] to discontinue paying all its merchants for inside the [standard power factor range] reactive power service."); *E.ON*, 119 FERC ¶ 61,340 at P 15 (accepting proposal to compensate no generators for reactive power within the standard power factor range); *Entergy Servs., Inc.*, 113 FERC ¶ 61,040 at P 38 (accepting tariff revisions setting charge for reactive power to zero).

[186] We believe that the dissent places more weight on the phrase "as a general matter" in the D.C. Circuit's *Dynegy* decision than that phrase can bear.  In that paragraph of its decision, the D.C. Circuit acknowledged the Commission's finding that zero compensation for reactive power within the deadband is just and reasonable, while contrasting that finding with the opportunity for RTOs and ISOs to offer proposals for alternative compensation pursuant to the independent entity variation, which the Commission would need to evaluate on a case-by-case basis.  *Dynegy*, 633 F.3d at 1125 (citing Order No. 2003, 104 FERC ¶ 61,103 at PP 546, 548).

[187] *See PNM*, 178 FERC ¶ 61,088 at P 29; *Nevada Power*, 179 FERC ¶ 61,103 at P 20; *Bonneville*, 120 FERC ¶ 61,211 at P 20; *E.ON*, 119 FERC ¶ 61,340 at P 15; *Entergy Servs., Inc.*, 113 FERC ¶ 61,040 at P 38.

an independent generator for reactive power within the standard power factor range when its own or affiliated generators are no longer being compensated.[188]  We find those protests that challenge these well-established policies to be collateral attacks on these earlier determinations.

54.    We find unpersuasive protesters' arguments that it is not just and reasonable to eliminate compensation for Reactive Service within the standard power factor range because generators have come to rely on the compensation for Reactive Service in order for the generators to remain financially viable.[189]  The Commission has previously rejected such arguments, finding that all newly interconnecting generators are required to provide reactive power within the power factor range of 0.95 leading to 0.95 lagging as a condition of interconnection.[190]  Accordingly, by designing their generating facilities to have the capability to provide reactive support, interconnecting generators are meeting the conditions of interconnection required of all generators and as a general matter are not entitled to compensation under the Commission's precedent unless the transmission provider pays its own or affiliated generators for reactive power within the standard power factor range.[191]

55.    We also disagree with protesters' contention that by eliminating reactive power compensation within the standard power factor range, system reliability will be impacted.[192]  As stated by MISO TOs and supporting commenters, new and existing generators in MISO will still be required to provide reactive power within the standard

---

[188] *See, e.g.*, Bonneville Order on Rehearing, 125 FERC ¶ 61,273 at P 18; Entergy Rehearing Order, 114 FERC ¶ 61,303 at P 17.

[189] EDF Protest at 5-6, 18-19; Cubico Parties Protest at 11, 13; Vistra Protest at 22-23; AQN Wind Protest at 7.

[190] *See, e.g.*, *Nevada Power*, 179 FERC ¶ 61,103 at P 22.

[191] *See, e.g.*, Order No. 2003-A, 106 FERC ¶ 61,220 at P 416; *SPP*, 119 FERC ¶ 61,199 at P 28 ("the provision of sufficient reactive power is an obligation of a generator interconnected to the system, and . . . as a general matter, a generator is not entitled to separate compensation for providing reactive power within its deadband.").

[192] EPSA Protest at 3; SEIA Protest at 6-12; Wolverine Protest at 4-10; Cubico Parties Protest at 8-9; EDF Protest at 4, 6-16; American Clean Power Protest at 12; Clean Energy Generation Owners Protest at 23-24; Midwest Power Producers Protest at 4, 17-19, 23; Orsted Protest at 6-7; REC Protest at 10-11, 14-16; Vistra Protest at 3-13; Vistra Answer at 2-3; SEIA Answer at 2-4.

power factor range as a condition of obtaining and maintaining an interconnection.[193]
MISO TOs do not propose to change MISO's ability to manually redispatch individual
generators for voltage control and generators will continue to be compensated under a
separate Tariff mechanism if MISO directs a generation resource to provide reactive
power outside of the standard power factor range.[194]  In addition, we find the arguments
that MISO TOs' proposal will jeopardize reliability by forcing uneconomic generators
into retirement or SSR designations are speculative and without support.[195]  Furthermore,
the Commission has found that reactive power service within the standard power factor
range requires little or no incremental investment.[196]  Nonetheless, if a resource's
retirement creates a voltage issue and it is "required by [MISO] to maintain the reliability
of the Transmission System . . . after completing a reliability study (Attachment Y
Reliability Study) and analyzing potential alternatives (Attachment Y Alternatives
Study), [MISO may] determine[] that SSR Unit status is justified," making the resource
eligible to receive cost-based compensation to support its continued operation until an
alternative solution is developed.[197]

---

[193] Transmittal at 9-10; Alliant Comments at 9, 11; OMS Comments at 6; IAMU
Comments at 5; MISO TOs Answer at 18, 27-28, 39; Alliant Answer at 6.

[194] Transmittal at 2, 9; OMS Comments at 6 (citing MISO Tariff, Module C,
§§ 40.3.5, 40.3.6; *id.*, Schedule 27).  As MISO TOs and protesters note, manual
redispatch instruction for voltage control are rare.  *See* Transmittal at 9 n.34; Wolverine
Protest at 5; SEIA Protest at 6-7.

[195] EDF Protest at 7; Midwest Power Producers Protest at 19; Vistra Answer at 2-
5.

[196] *See, e.g.*, *Bonneville*, 120 FERC ¶ 61,211 at P 21 (finding that the incremental
cost of reactive power service within the deadband is minimal); *Mich. Elec. Transmission
Co.*, 97 FERC at 61,852-53 ("reactive power provided, not as an ancillary service, but
rather as a 'no cost' service within reactive design limitations, may therefore, be provided
without compensation"); *Ariz. Pub. Serv. Co.*, 94 FERC ¶ 61,027, at 61,080 (2001)
(rejecting generators arguments for reactive power compensation for operating within
standard power factor range because the generators failed to demonstrate that "such a
requirement will limit the real power output of a generating unit and therefore will not
result in any lost opportunity costs" or that operating a generating unit within the
proposed deadband will "affect the generation output of a unit").

[197] MISO, FERC Electric Tariff, Module C (Energy and Operating Reserve
Markets), § 38.2.7. (Generation Suspension, Generation Retirement, and System Support
Resources) (54.0.0), § 38.2.7(b).

56.    We further disagree with protesters that MISO TOs' proposal should be rejected because it is distinguishable from *Nevada Power* and *PNM*.  In *Nevada Power* and *PNM*, the transmission provider proposed revisions to Schedule 2 that resulted in the elimination of reactive power compensation within the standard power factor range, consistent with the Commission's reactive power compensation precedent.  Similar to *Nevada Power* and *PNM*, here, we find that MISO TOs' proposal is consistent with precedent, which provides that MISO TOs do not have an obligation to continue to compensate an independent generator for reactive power within the standard power factor range when its own or affiliated generators are no longer being compensated.  For the same reason, we disagree that *CAISO* is inapplicable because the transmission provider had never provided reactive power compensation under Schedule 2, in contrast to MISO.[198]  We also disagree with protesters that the facts here—that is, the number of independent power producers in MISO or that the proposal is not limited to MISO TOs' own generation and unaffiliated generation connected to their respective systems—warrant a different determination.  The Commission's reactive power compensation precedent has not been limited to non-RTO regions.[199]

57.    In addition, the Commission has previously found, and the D.C. Circuit affirmed, that a MISO transmission owner's FPA section 205 filing rights are not limited to its own individual ancillary service rates and thus, the instant proposal appropriately applies to all Schedule 2 rates within MISO.[200]  Finally, we disagree that *Nevada Power*, *PNM*, and *SPP* are distinguishable because, in those cases, it was the transmission provider filing the relevant proposals.[201]  As discussed below, we find that MISO TOs were authorized to file their proposal under FPA section 205.[202]

58.    We also find unpersuasive protesters' arguments that MISO TOs' proposal violates the Commission's comparability standard because it discriminates against independent power producers.[203]  Protesters argue that MISO TOs that own generation

---

[198] Clean Energy Generation Owners Answer at 12-13 (citing *CAISO*, 160 FERC ¶ 61,035; OMS Comment at n.9).

[199] *See SPP*, 119 FERC ¶ 61,199.

[200] *MISO*, 122 FERC ¶ 61,305 at P 24, *aff'd in part*, *Dynegy*, 633 F.3d at 1128-29.

[201] Clean Energy Generation Owners Answer at 11.

[202] *See infra* PP 63-64.

[203] Cubico Parties Protest at 7; SEIA Protest at 2-3; Wolverine Protest at 3, 13; EPSA Protest at 4; American Clean Power Protest at 7, 9-10; Clean Energy Generation

will have a competitive advantage over independent power producers because they will be able recover their lost revenue through their retail rates.[204]  This argument has been raised previously and rejected by the Commission.[205]  In *SPP*, for example, the Commission found that eliminating reactive power compensation for both affiliated and non-affiliated generators treated all generators on a comparable basis notwithstanding that transmission owners in the SPP region might have the opportunity to recover the revenue they lost through their retail rates.[206]  The Commission explained that this possibility did not create a comparability issue because there was no difference in the treatment that SPP accorded affiliated and non-affiliated generators.  And just as the MISO TOs' generators may try to recover their lost revenue through higher power sales rates, so too may independent power producers try to recover their lost revenue through their own higher power sales rates.[207]  "[C]omparability does not require that the Commission guarantee [independent power producers'] recovery for reactive power costs within the deadband."[208]  Indeed, "all that the transmission owners have is an *opportunity* to recover their costs in retail rates.  The transmission owners' generators are not entitled to charge retail customers retail rates that guarantee full recovery of their costs; rather, they must first justify their rates to state authorities."[209]  Moreover, the fact that state commissions may allow a utility to recover costs for reactive power service within the standard power factor range from retail customers in retail rates (which we do not

---

Owners Protest at 19-21; Midwest Power Producers Protest at 4; Orsted Protest at 6; REC Protest at 17; Vistra Protest at 14-15; Clean Energy Generation Owners Answer at 8-9.

[204] American Clean Power Protest at 8 (citing Calpine Corporation, Request for Rehearing, Docket No. RM02-1-001, at 11 (filed Aug. 25, 2003) (Calpine Rehearing Request); Order No. 2003-A, 106 FERC ¶ 61,220 at P 416); Cubico Parties Protest at 6-7 (citing Calpine Rehearing Request at 11).

[205] *See, e.g.*, *SPP*, 119 FERC ¶ 61,199; *Bonneville*, 120 FERC ¶ 61,211.

[206] *SPP*, 119 FERC ¶ 61,199 at P 39; SPP Order on Rehearing, 121 FERC ¶ 61,196 at PP 16-18.

[207] Vistra argues that costs recovered through Schedule 2 are not variable costs a generator would include in energy offers or going-forward costs that could be included in capacity offers.  *See* Vistra Answer at 3.  Vistra does not explain what these costs are or provide support as to why Vistra would not include these costs in energy offers and could not include them in capacity offers.

[208] SPP Order on Rehearing, 121 FERC ¶ 61,196 at P 18.

[209] *Id*. (emphasis in original).

concede they do) does not dictate that the Commission must allow recovery of such costs through a reactive power charge under Schedule 2.[210]

59.    Because it is outside the scope of this proceeding and not within the Commission's jurisdiction, we also reject protesters' argument that MISO TOs have failed to demonstrate that they have removed the generation plant investment associated with the production of reactive power from retail rates and that they are not charging retail customers for the fixed costs of reactive power equipment unless their plants must operate outside the standard power factor range.[211]  As the Commission stated in *SPP*, "the notion that . . . transmission owners have an affirmative obligation to demonstrate that they have removed generation plant investment associated with production of reactive power from retail rates . . . is outside the scope of [the] filing, and not within the Commission's jurisdiction."[212]  In addition, protesters fail to adequately explain how the revenue requirements associated with the provision of Reactive Service are being recovered through the transmission owner's bundled retail rates, allowing them to still benefit from a substantial reactive power revenue stream, and why the elimination of compensation for Schedule 2 Reactive Service requires changes to transmission owners' retail rates.[213]

60.    It is for these same reasons that we find some protesters' reliance on *Conway* unpersuasive.  We acknowledge that it is a possibility that the transmission owners' generators might recover their lost reactive power revenues through their retail rates. However, just as in *SPP*,[214] here MISO TOs are treating their own and affiliated generation resources comparably to independent power producers' generation resources; neither will recover compensation for the capability to provide reactive power within the standard power factor range under MISO's Schedule 2 and both may pursue recovery of any lost revenue in other ways.  Notably, EDF and American Clean Power acknowledge that recovery of this revenue can be accomplished through power purchase agreements.[215]

---

[210] *See SPP*, 119 FERC ¶ 61,199 at P 39 & n.37.

[211] SEIA Protest at 2; Wolverine Protest at 14; Clean Energy Generation Owners Protest at 20, 21; Clean Energy Generation Owners Answer at 8-9.

[212] *SPP*, 119 FERC ¶ 61,199 at P 37.

[213] *See, e.g.*, Midwest Power Producers Protest at 16; SEIA Protest at 2; Wolverine Protest at 4-5; Clean Energy Generation Owners Protest at 20-21.

[214] SPP Order on Rehearing, 121 FERC ¶ 61,196 at PP 19-20.

[215] EDF Protest at 10, 13.

61.    For similar reasons, we reject protesters' argument that, unlike independent power producers, MISO TOs will continue to be compensated for their transmission-installed reactive devices.  As explained above, comparability requires that transmission owners treat unaffiliated generators comparably to their own and affiliated generators under Schedule 2, which we have found MISO TOs have done.

62.    For similar reasons, we reject Vistra's arguments that MISO TOs' proposal violates the Takings Clause of the Fifth Amendment to the U.S. Constitution and the Due Process Clause of the U.S. Constitution.[216]  As discussed above, the Commission has consistently held that "the provision of sufficient reactive power is an obligation of a generator interconnected to the system, and . . . as a general matter, a generator is not entitled to separate compensation for providing reactive power within its deadband."[217]  As the Commission explained in *SPP*, if a generator is to sell (and be able to deliver) its power to a customer, reactive power is essential to the transaction.[218]  The exception to this general rule is that the transmission provider must provide such compensation to all generators, if it does so for its own and affiliated generation resources.[219]  In addition, as discussed above, MISO TOs' own and affiliated generation resources and unaffiliated generation resources may pursue recovery of any lost revenue in other ways.[220]  Therefore, we find that MISO TOs' proposal does not violate the Takings Clause or the Due Process Clause.

63.    We also reject protesters' argument that MISO TOs have no authority to file their proposal under FPA section 205 because MISO TOs have unilateral FPA section 205 filing rights only for their own generators.[221]  Section 9.6.3 of the MISO *pro forma* GIA provides that Reactive Service compensation shall be pursuant to a rate schedule filed by the transmission provider, and the MISO TO Agreement, Appendix K expressly provides a mechanism through which MISO and MISO TOs may make FPA section 205 filings regarding ancillary services, other than Schedule 1, which MISO did here.  The Commission has previously found, and the D.C. Circuit affirmed, that pursuant to the

---

[216] Vistra Protest at 17, 21-25; Vistra Answer at 6-7.

[217] *SPP*, 119 FERC ¶ 61,199 at P 28; *see* Bonneville Order on Rehearing, 125 FERC ¶ 61,273 at P 18.

[218] *See SPP*, 119 FERC ¶ 61,199 at P 28.

[219] Order No. 2003-A, 106 FERC ¶ 61,220 at P 416.

[220] *Bonneville*, 120 FERC ¶ 61,211 at P 20; Bonneville Order on Rehearing, 125 FERC ¶ 61,273 at P 11.

[221] Midwest Power Producers Protest at 6-10; Vistra Protest at 26-28.

settlement adopting section 9.6.3 of the MISO *pro forma* GIA, "transmission owners and the Midwest ISO share the same section 205 filing right, which is 'the right to submit filings under FPA section 205 to govern the rates, terms, and conditions applicable to the provision of ancillary services.'"[222]  Moreover, the Commission rejected the argument that section 9.6.3 merely confirmed transmission owners' rights to make section 205 filings with their own individual ancillary service rates, stating that "it contemplates that transmission owners will submit section 205 filings that have '*regional impacts*.'"[223]

64.    We also reject protesters' argument that MISO TOs have no authority to file their proposal under FPA section 205 as MISO TOs did not comply with the notice requirements under Appendix K of the MISO TO Agreement.[224]  On October 21, 2022, a majority of the Owners that own or control generation or other resources capable of providing ancillary services voted to file the proposed Tariff revisions.  In their answer, MISO TOs assert that, on October 30, 2022, MISO received notice of MISO TOs' plan to file on November 30, 2022, and was provided a description of the filing with a copy of the draft Tariff revisions, meeting the notice requirement of the MISO TO Agreement.[225]  Neither MISO nor any Owner disputes this assertion.  While the Notice from MISO to Stakeholders contains information that MISO received on November 11, 2022, we find that information does not affirmatively indicate when MISO received notice of the intent of MISO TOs to make the instant filing.[226]  Accordingly, we find that MISO TOs complied with the requirement of the MISO TO Agreement to provide 30 days' notice.  In addition, we disagree that MISO TOs' proposal should be rejected because MISO TOs failed to identify the entities comprising the majority who voted in favor of this FPA section 205 filing.[227]  Appendix K defines Owners as public utilities, which is a subset of the MISO transmission owners, and, of that subset, Owners with filing rights for Schedule 2 are only those that own or control generation or other resources capable of providing reactive service.[228]  MISO TOs explain that a large majority of that subset of

---

[222] *MISO*, 122 FERC ¶ 61,305 at PP 22, 24, *aff'd in relevant part*, *Dynegy*, 633 F.3d at 1128-29.

[223] *Id.* P 25 (emphasis added).

[224] American Clean Power Protest at 2-5; Midwest Power Producers Protest at 5-6; REC Protest at 6; Cubico Parties Protest at 4-6.

[225] *See* MISO TOs Answer at 31.

[226] American Clean Power Protest, attach. A (Notice from MISO to Stakeholders).

[227] Clean Energy Generation Owners Answer at 3-4.

[228] MISO TO Agreement, App. K §§ I.I, II.I.

Owners voted to make the instant filing.  While exact numbers of those Owners that were eligible and voted were not provided, Appendix K includes no such requirement.  In addition, neither MISO nor any Owner with voting rights pursuant to the MISO TO Agreement has raised any concerns in this docket with any violation of their voting rights or the methodology of the vote that was taken on October 21, 2022.

65.     Moreover, we reject protesters' argument that MISO TOs' proposal undercuts independent power producers' FPA section 205 filing rights.[229]  MISO's *pro forma* GIA entitles interconnection customers (including independent power producers) to compensation for reactive power consistent with the rates set forth in any tariff or rate schedule filed by transmission provider and approved by the Commission — in this case, Schedule 2.  Currently, Schedule 2 establishes such rates consistent with a resource's individually filed rate schedule.[230]  Under MISO TOs' proposal, Schedule 2 rates will be set to zero, consistent with MISO TOs' filing rights with respect to Schedule 2.[231]  Therefore, we find that MISO TOs' proposal does not restrict independent power producers' FPA section 205 rights to file a rate for reactive power; instead, the proposal addresses only the rates chargeable to transmission customers under Schedule 2 and by extension, payable to resources consistent with their GIAs, not any independent right of generators to seek compensation under FPA section 205.

66.     We reject protesters' arguments that MISO TOs should have instead made FPA section 206 filings.[232]  We also reject REC's request to direct MISO to continue paying REC, after the effective date established in this order, until an FPA section 206 filing is made to eliminate REC's reactive power rate schedule.  As described above, MISO TOs have the unilateral right to change Schedule 2 through an FPA section 205 filing and by doing so, they automatically change the rate payable for Reactive Service that generators contractually agreed to in section 9.6.3 of their GIAs.[233]  Therefore, we find that MISO TOs were not required to file under FPA section 206.  For similar reasons, we reject the

---

[229] *See, e.g.*, Midwest Power Producers Protest at 10-14.

[230] Section 9.6.3 of the MISO *pro forma* GIA states that "[p]ayments for reactive power shall be pursuant to any tariff or rate schedule filed by Transmission Provider and approved by the FERC."

[231] Transmittal at 5.

[232] *See, e.g.*, American Clean Power Protest at 13.

[233] *See supra* P 63.  As explained above, and unlike section 9.6.3 of the *pro forma* LGIA, section 9.6.3 of MISO's *pro forma* GIA provides that compensation for reactive power shall be consistent with the rates set forth in any tariff or rate schedule filed by transmission provider and approved by the Commission — in this case, Schedule 2.

argument that MISO TOs were required to go through the stakeholder process,[234] as the process for filing revisions to Schedule 2 is governed by section 9.6.3 of the MISO *pro forma* GIA and MISO TO Agreement, Appendix K.[235]

67.     We grant MISO TOs' request for waiver of the Commission's 60-day prior notice requirement to allow an effective date of December 1, 2022 for the elimination of Schedule 2 Reactive Service compensation, because it will reduce charges to MISO's transmission customers, consistent with *Central Hudson*.[236]

The Commission orders:

　　　　MISO TOs' proposed Schedule 2 revisions are hereby accepted, effective December 1, 2022, as requested, as discussed in the body of this order.

By the Commission.  Commissioner Danly is dissenting in part with a separate statement attached.
　　　　　　　　　　　Commissioner Clements is concurring with a separate statement attached.

( S E A L )


　　　　　　　　　　　　　　Debbie-Anne A. Reese,
　　　　　　　　　　　　　　Deputy Secretary.

---

[234] Orsted Protest at 6; American Clean Power Protest at 3-4; Cubico Parties Protest at 4-6; AQN Wind Protest at 5-6.

[235] *See MISO*, 122 FERC ¶ 61,305 at P 47 (finding that transmission owners were not required to submit revisions to Schedule 2-A through the stakeholder process, and instead appropriately filed pursuant to unilateral FPA section 205 rights).

[236] *Central Hudson*, 60 FERC at 61,338 ("We will generally grant waiver of the 60-day prior notice requirement . . . [for] filings that reduce rates and charges—such as rate decreases . . . .").

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.          Docket No.  ER23-523-000

(Issued January 27, 2023)

DANLY, Commissioner, *dissenting*:

1.      I dissent from this order approving the MISO Transmission Owners' (MISO TOs') proposal to eliminate reactive power compensation in MISO.[1]  The MISO TOs have not met their burden under section 205 of the Federal Power Act that this rate proposal— which eliminates all reactive power rates within the standard power factor range in MISO—is just and reasonable, given the record's substantial unrebutted evidence of the negative rate impacts that this will have on generators not affiliated with the MISO TOs.[2]

2.      There is no question the MISO TOs did not have to adopt a regime that compensated both their own generation and unaffiliated generation for reactive power. Order 2003-A provides that "if the Transmission Provider pays its own or its affiliated generators for reactive power within the [standard power factor] range, it must also pay" unaffiliated interconnecting generators.[3]  But the MISO TOs decided to compensate their own generation, and thus were obligated to also compensate unaffiliated interconnecting generation for reactive power.  That has been the rate in effect until today's order.

3.      It also is true that the number of unaffiliated generators seeking and collecting reactive power compensation in MISO has grown substantially in recent years, and record evidence suggests it currently is a $220 million annual revenue requirement,[4] and increasing.[5]  I share concerns that the current practice of setting individual reactive power rate cases for hearing and settlement—particularly when there are often no parties in

---

[1] *Midcontinent Indep. Transmission Sys. Operator, Inc.*, 182 FERC ¶ 61,033 (2023).

[2] *See id.* PP 16-22 (summarizing record evidence).

[3] *Standardization of Generator Interconnection Agreements & Procedures*, Order No. 2003-A, 106 FERC ¶ 61,220, at P 416 (2004).

[4] Vistra Corp. & Dynegy Marketing & Trade, LLC December 21, 2022 Protest, at 3.

[5] *See, e.g.*, MISO Transmission Owners January 10, 2023 Motion for Leave to Answer and Answer, at 37-39 (highlighting growth).

opposition and the settlement is with FERC Trial Staff—is an inefficient mechanism for establishing reactive power rates.

4.     Notwithstanding these increased rates and the administrative burden, the Commission cannot simply accept the MISO TOs' proposal unless they meet their section 205 burden that the proposed rate—in this case, the elimination of reactive power compensation—is just and reasonable based on substantial evidence in the record. The MISO TOs have not offered any evidence of the effects of eliminating the $220 million annual reactive power revenue requirement from the MISO tariff. Indeed, the only evidence in the record on this critical point is from unaffiliated generators—largely smaller renewable resources—that the impact of the reactive power rate elimination will be severe.[6] I do not know whether this is, in fact, the case, but the Commission must decide whether to accept a section 205 filing based on the record before it. What is clear is that separate reactive power compensation has been available in MISO for several years. Parties have taken this into account in their financings, bilateral contracting, power purchase agreements, and other arrangements. The elimination of reactive power rates as of December 1, 2022, may have a significant enough effect on these existing arrangements to render the MISO TOs' proposed zero rate unjust and unreasonable. On this record, we simply cannot know.

5.     It may well be that the correct rate for reactive power is zero.[7] Indeed, as the primary support for their section 205 filing, the MISO TOs simply cite Order 2003 and 2003-A and recent Commission precedent eliminating reactive power compensation.[8] But in prior cases, the Commission eliminated reactive power compensation when only a handful of unaffiliated generators were receiving—or still seeking—it. The situation in MISO clearly is distinguishable where scores of generators are recovering reactive power compensation and it has been a part of the MISO tariff for years. Moreover, to the extent that parties, or the Commission, may argue that the Commission has predetermined that a reactive power compensation rate of zero within the standard power factor range is always just and reasonable, Order No. 2003 does not go that far. It found merely that, "as

---

[6] *See supra* note 2 (citing record evidence).

[7] *See Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1125 (D.C. Cir. 2011) (recounting that Order 2003 found "as a general matter, [that] a generator should not be compensated for providing reactive power within a specified range, the deadband, 'since it is only meeting its obligation [to do so]'") (citing *Standardization of Generator Interconnection Agreements & Procedures*, Order No. 2003, 104 FERC ¶ 61,103, at P 546 (2003)).

[8] *See Nev. Power Co.*, 179 FERC ¶ 61,103, at PP 20-21 (2022); *Pub. Serv. Co. of N.M.*, 178 FERC ¶ 61,088, at PP 29-31 (2022).

a general matter" no compensation is due to a generator that is fulfilling its obligations.[9] Such a caveat implies, at the least, that there *could* be circumstances in which compensation could be due.  Certainly, neither the D.C. Circuit nor the Commission has held that unaffiliated generators could collect reactive power compensation for several years (currently at $220 million per year in MISO) and then a transmission provider could toggle to a zero rate without first making the necessary showing that the proposed rate is just and reasonable under section 205.

6.      The MISO TOs must present substantial evidence that the elimination of reactive power compensation is just and reasonable given the circumstances in MISO.  The MISO TOs have not done so.  I would dismiss the section 205 filing without prejudice to refiling with additional evidence on the justness and reasonableness of a zero rate for reactive power given the overall rate structure of the MISO markets.  Alternatively, I would set this issue for hearing.

        For these reasons, I respectfully dissent.


_____
James P. Danly
Commissioner


---

        [9] *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d at 1125; *see also Midcontinent Indep. Transmission Sys. Operator, Inc.*, 182 FERC ¶ 61,033 at P 52, n.186 (discussing same).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.          Docket No.  ER23-523-000

(Issued January 27, 2023)

CLEMENTS, Commissioner, *concurring*:

1.    I concur with today's decision to approve the MISO Transmission Owners'
(MISO TOs) proposed revisions to Schedule 2 to remove reactive power compensation
within the standard power factor range.  I write separately to explain why I would have
preferred we reached a resolution of this issue in a way that could have incorporated
more stakeholder input from the start.

2.    The status quo in MISO is not working for many reasons.[1]  Today's Order details
the precedential and legal bases for our decision, but there are also policy considerations
worth highlighting.  The Commission's current cost-based *AEP* methodology for reactive
power compensation is poorly suited for newer technologies and non-synchronous
generation like wind, solar, and storage.  Application of this methodology to the region's
generators on a case-by-case basis using the Commission's hearing and settlement judge
procedures is administratively burdensome and has led to numerous black box
settlements which, by design, lack transparency into the components of the rate.  And, if
well-resourced companies can hire experienced lawyers and expert witnesses to negotiate
black box rates, the level of reactive power compensation is arguably a question of how
effectively an applicant can play the game.  Taking these flaws together, it is far from
clear that the black box rates that customers are paying have anything to do with the
provision of reactive power service needed for system reliability and voltage support.
Meanwhile, customer costs continue to increase.[2]

3.    Even though this case reaches the right result based on the filing presented to us, I
would have preferred a different procedural approach.  Whether or not generators located
in MISO were justified in relying on continued reactive power compensation, parties

---

[1] MISO is not the only region with a cost-based reactive power compensation
regime, but my comments today are limited to MISO.

[2] For example, one party explains that since the fall of 2020, the annual reactive
power revenue requirement charges across MISO pricing zones have increased
approximately 17% and is expected to continue to increase.  Alliant Energy Corporate
Services Comments at 10.

have stated in the record that this decision will cause financial disruption.[3]  This filing emphasizes the importance for the Commission to act quickly on the existing generic proceeding, Docket No. RM22-2.  On a generic basis, we could consider other reactive power compensation solutions or procedural mechanisms, like phasing out existing rates, to counter the impact of sudden rate elimination.  But because we find ourselves in the position of reacting to the filing before us, we cannot entertain other solutions.  Likewise, it is a missed opportunity for the MISO TOs to have declined to involve stakeholders earlier in the process—which may have led to a filing or approach that drew fewer protests—even if the MISO TOs were not required to do so under the MISO TO Agreement.

4.       Going forward, I encourage stakeholders in MISO to consider more effective alternatives to cost-based reactive power compensation.  Services should be appropriately compensated for the benefits they provide, and reactive power plays an important reliability function.  Notwithstanding the result of today's order, I remain open to the possibilities of other reactive power compensation options.  As examples, stakeholders may wish to consider market solutions and/or compensation models that are based on the performance of the generators in providing reactive power when called upon, or that incentivize reactive power generation to be located where additional reactive supply is most needed from a reliability perspective.

           For these reasons, I respectfully concur.



_____
Allison Clements
Commissioner


---

[3] *See, e.g.*, EDF Renewables Protest at 5-6, 17-20; Cubico Parties Protest at 11-13; Vistra Corp. Protest at 22-23; AQN Wind Projects Protest at 6-7.  Other parties have proposed alternative ways this revenue could be obtained, e.g., through higher energy or capacity market offers or through power purchase agreement negotiations.  However, the record is mixed about how realistic those paths are to recapturing lost revenue in the short term.

182 FERC ¶ 62,180
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.          Docket No. ER23-523-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(March 30, 2023)

Rehearing has been timely requested of the Commission's order issued on
January 27, 2023, in this proceeding. *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC
¶ 61,033 (2023). In the absence of Commission action on a request for rehearing within
30 days from the date it is filed, the request for rehearing may be deemed to have been
denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v.
FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the requests for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Kimberly D. Bose,
Secretary.